# FILED

OCT 1 7 2012

CLERK U.S. DISTRICT COURT
WEST. DIST. OF PENNSYLVANIA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. 12-262 |
| | ) | |
| Plaintiff, | ) | Judge |
| | ) | |
| v. | ) | **I N D I C T M E N T** |
| | ) | **[UNDER SEAL]** |
| RICHARD A. RYDZE, | ) | |
| WILLIAM ZIPF, | ) | Title 21, United States Code, Sections |
| JAMES HATZIMBES, aka "Hatz", | ) | 841(a)(1) & (b)(1)(C), 843(a)(3) and 846; |
| | ) | Title 18, United States Code, Sections 371, |
| Defendants. | ) | 1347 and 1503. |

The Grand Jury charges:

## GENERAL ALLEGATIONS

At all times material to this Indictment:

### A.    The Controlled Substances Act

1.    The Controlled Substances Act ("CSA") governed the manufacture, distribution, and dispensation of controlled substances in the United States. 21 U.S.C. §§ 801-971.

2.    Various prescription drugs were scheduled substances under the CSA. The CSA scheduled controlled substances according to their potential for abuse or dependence, their accepted medical use, and their accepted safety or use under medical supervision. 21 U.S.C. §

-2-

812(b). There were five schedules of controlled substances: Schedules I, II, III, IV, and V. Drugs

were scheduled into these levels based on their potential for abuse and physical and

psychological addiction. 21 U.S.C. § 812(a).  Schedule II drugs have a high potential for abuse

and abuse of these drugs may lead to severe psychological or physical dependence.  21 U.S.C. §

812(b)(2).  Schedule III drugs have a lower potential for abuse than Schedule II drugs, but abuse

of these drugs may lead to moderate to low physical dependence and high psychological

dependence. 21 U.S.C. § 812(b)(3).

3.      Opium and opiates and any salt, compound, derivative, or preparation of opium or

opiates, such as Opana ER, Oxycontin, Oxycodone HCL, Oxymorphone, and hydrocodone, were

Schedule II controlled substances.

4.      Anabolic steroids, such as the drugs Stanozolol, Nandrolone Decanoate,

Testosterone Enanthate, Testosterone Suspension, Testosterone Propionate, Oxandrolone,

Testosterone Cypionate, and Testosterone, were Schedule III controlled substances.

**B.      The Federal Food, Drug, and Cosmetic Act**

5.      The U.S. Food and Drug Administration ('FDA") was the federal agency charged

with the responsibility for protecting the health and safety of the American public by enforcing

the Federal Food, Drug, and Cosmetic Act ("FDCA"). 21 U.S.C. §§ 301 et seq. The FDA's

responsibilities under the FDCA included regulating the manufacture, labeling, and distribution

of all drugs and drug components shipped or received in interstate commerce.

6.      The FDCA prohibited the knowing distribution of, or possession with intent

to distribute, human growth hormone for any use in humans other than the

treatment of a disease or other recognized medical condition, where such use had been

authorized by the Secretary of Health and Human Services under 21 U.S.C. § 355, and

-3-

was pursuant to the order of a physician. 21 U.S.C.§ 333(e).

7.     The Secretary had not, pursuant to 21 U.S.C. § 355, authorized the use of human growth hormone for anti-aging, body building, or athletic performance enhancement purposes.

8.     FDA approved human growth hormone could only be legally prescribed for a limited number of conditions, to include:

   a.  hormonal deficiency that causes short stature in children;

   b.  long-term treatment of growth failure due to lack of exogenous GH secretion;

   c.  long-term treatment of short stature associated with Turner's Syndrome;

   d.  adult short bowel syndrome;

   e.  adult deficiency due to rare pituitary tumors or their treatment; and

   f.  muscle-wasting disease associated with HIV/AIDS.

9.     Omnitrope, Genotropin, Somatropin, Norditropin, and Tev-Tropin were human growth hormone.

10.     The Anabolic Steroid Control Act of 2004 defined "anabolic steroids" as any drug or hormonal substance, chemically and pharmacologically related to testosterone (other than estrogens, progestins, corticosteroids, and dehydroepiandrosterone). Anabolic steroids mimic the effects of the male sex hormones testosterone and dihydrotestosterone, and increase protein synthesis within cells which results in the buildup of cellular tissue, especially in muscles. Anabolic steroids are Schedule III controlled substances, which makes it illegal to distribute unless it is done pursuant to the order of a physician and it is for the purpose of treating a disease. Legitimate medical applications include therapeutic use to stimulate muscle growth and appetite for those afflicted with chronic wasting conditions, such as cancer and AIDS, and to induce male

-4-

puberty and treat certain sexual dysfunctions when medically supervised.

### C.    The Defendants and Related Businesses

11.    The defendants were part of a drug distribution network, supplying controlled substances, human growth hormone, and other prescription drugs to customers through various businesses, including Optimal Health Center L.L.C., HSE Anti-Aging & Wellness Center aka HSE Salon and Wellness Center, and ANEWrx Pharmacy.

#### Optimal Health Center L.L.C.

12.    Optimal Health Center L.L.C. ("OHC") was located at 425 First Avenue at Cherry Way, Pittsburgh, Pennsylvania, and was opened in September 2007.  Dr. RICHARD A. RYDZE was the sole owner of OHC and was a medical doctor licensed to practice and DEA-registered to prescribe controlled substances in the State of Pennsylvania.  Prior to OHC, Dr. RYDZE was involved with other physicians in a joint medical practice known as Diagnostic Medical Associates ("DMA").  The practice became associated with The University of Pittsburgh Medical Center ("UPMC") in about 2000 and changed its name to DMA-UPMC.

13.    OHC Employee #1 was employed as a registered nurse at OHC beginning on or about September 1, 2007.  She previously worked with Dr. RICHARD A. RYDZE at the University of Pittsburgh Medical Center ("UPMC") beginning in 1987.

#### HSE Anti-Aging & Wellness Center aka HSE Salon and Wellness Center
#### and DME Plus, Inc.

14.    JAMES HATZIMBES, aka "Hatz", owned and operated HSE Salon and Wellness Center aka HSE Anti-Aging & Wellness Center (" HSE"), formerly located at 2851 Saw Mill Run, Pittsburgh, Pennsylvania.  The business was located in a strip mall, where JAMES HATZIMBES also owned and operated Hatz's Solar Eclipse Tanning.  On January, 29, 2011,

-5-

HSE became co-located with DME Plus, Inc. ("DME") at 55 Old Clairton Road, Pittsburgh, Pennsylvania. DME was a durable medical equipment company also owned and operated by JAMES HATZIMBES.

15.    DME Employee #1 was employed by DME as a consultant from March of 2010 through July 11, 2011. DME Employee #1 also worked every other Saturday for JAMES HATZIMBES at HSE, where Dr. RICHARD A. RYDZE would see patients interested in "anti-aging" treatments such as hormone replacement therapy, Juvederm, Botox, and B-12 injections.

### ANEWrx

16.    ANEWrx was a pharmacy located in Pittsburgh, Pennsylvania. ANEWrx filled prescriptions for controlled and non-controlled substances. ANEWrx was licensed in Pennsylvania and at least 44 additional states to dispense drugs requiring prescriptions and was registered by the DEA to dispense Schedule III controlled substances - including Stanozolol, Nandrolone Decanoate, Testosterone Enanthate, Oxandrolone, Testosterone Cypionate, and Testosterone. ANEWrx also dispensed non-controlled prescription drugs, such as human growth hormone, Chorionic Gonadotropin ("HcG"), Sermorelin, Anastrozole, and Clomiphene Citrate. ANEWrx developed business relationships with numerous physicians and clinics that promoted the use of steroids, human growth hormone, and other prescription drugs for muscle repair, anti-aging, body building, and/or athletic performance enhancement.

17.    William Sadowski ("Sadowski") was the President and co-owner of ANEWrx. Sadowski was a pharmacist licensed to practice in Pennsylvania, and authorized by that state to dispense drugs pursuant to a valid prescription.

18.    John F. Gavin ("Gavin") was a registered nurse who was employed at ANEWrx from March 29, 2010 through April, 2011. Gavin was employed as a consultant for ANEWrx

and performed research for Sadowski on hormone replacement therapy, which included research on criminal prosecutions across the country for the illegal distribution of anabolic steroids and human growth hormone.

**D.    Use of Anabolic Steroids, Human Growth Hormone, and Other Prescription Drugs**

19.    Many of the anabolic steroids and human growth hormones were part of a "stack" or drug cocktail that included other prescription drugs, like HcG, Tamoxifen, and Anastrozole. "Stacking" is the practice of combining anabolic steroids, human growth hormone, and other prescription drugs for a period ranging from 6 to 12 weeks, or longer.

20.    Human growth hormone was included in the "stack" to promote muscle growth and leanness.  HcG was included in the "stack" to stimulate testosterone production in the testes. HcG was commonly used as part of the anabolic steroid cycle to maintain and restore testicular size and natural testosterone production, which often diminished as a result of the use of the anabolic steroids.

21.    Other prescription drugs distributed, dispensed, and sold to customers included the following estrogen blockers or anti-estrogen drugs: Clomiphene Citrate and Anastrozole. These drugs were included in the "stack" to prevent numerous negative side effects of taking anabolic steroids, including gynecomastia, the painful enlargement of a male users' breasts. When used legitimately, Anastrozole is used to treat various forms of breast cancer and to prevent recurrence of cancer after surgery or chemotherapy and Clomiphene Citrate is often prescribed to stimulate ovulation in females.

**E.    Pituitary Dwarfism**

22.    The American Medical Association defines Pituitary Dwarfism as an isolated

-7-

deficiency of (human) growth hormone, which results in dwarfism, with infantile physical

characteristics due to abnormally low secretion of growth hormone and gonadotropin deficiency.

The medical diagnosis code for Pituitary Dwarfism is 253.3 (variable 2533). It is a pediatric

diagnosis, used when laboratory testing indicates that a child's pituitary gland is not producing

growth hormone. Children diagnosed with Pituitary Dwarfism fail to grow, and thus have

dwarfed limbs, different facial characteristics, and do not reach five feet in height by adulthood.

23.     The proper diagnosis for an adult patient with a malfunctioning pituitary gland is

panhypopituitarism, and in ninety percent of cases, these patients have tumors which affect

pituitary function. Panhypopituitarism diagnoses are reached after multiple examinations,

extensive blood testing, computed axial tomography (CAT) scans, and magnetic resonance

imaging (MRI).

## COUNT 1
**(Conspiracy to Distribute Controlled Substances - Anabolic Steroids
in violation of 21 U.S.C. §§ 846 & 841(a)(1) & (b)(1)(E))**

The Grand Jury further charges:

24.     Paragraphs 1 through 23 of the General Allegations are incorporated as though

realleged in their entirety herein.

25.     On a date unknown to the Grand Jury, but at least as early as from in or about

September 2007, and continuing through on or about March 31, 2011, in Pittsburgh,

Pennsylvania, in the Western District of Pennsylvania, and elsewhere, the defendants, Dr.

RICHARD A. RYDZE and JAMES HATZIMBES, Defendants herein, and William Sadowski

and John Gavin, named but not charged herein, knowingly and intentionally combined,

conspired, confederated and agreed together and with each other, and with other persons known

and unknown to the Grand Jury to possess with the intent to distribute and distribute Schedule III

-8-

controlled substances, including the anabolic steroids Stanozolol, Nandrolone Decanoate,

Testosterone Enanthate, Testosterone Cypionate, Oxandrolone and Testosterone, in violation of

Title 21, United States Code, Sections 846 and 841(a)(1) & (b)(1)(E).

## OBJECT OF THE CONSPIRACY

26.     It was the purpose and object of the conspiracy for the defendants and their

co-conspirators to unjustly enrich themselves by causing the distribution of anabolic steroids for

unauthorized uses such as body building and athletic performance enhancement.

## MANNER AND MEANS

27.     The manner and means employed by the defendants to effect the object of

the conspiracy included the following:

     a.     Dr. RICHARD A. RYDZE saw patients at OHC, as well as at HSE, co-owned by

          JAMES HATZIMBES. Dr. RICHARD A. RYDZE would often see patients

          alone at OHC before 8:00 am, when the office officially opened.

     b.     Dr. RICHARD A. RYDZE and JAMES HATZIMBES agreed to hold "steroid

          clinics" at HSE for the purpose of illegally distributing anabolic steroids. The

          clinics were typically held every other Saturday and patients were scheduled

          approximately every thirty minutes.

     c.     Hormone replacement therapy was a large part of the HSE client base. Many of

          the clients were athletes who were seeking hormone replacement therapy and

          anabolic steroids to help improve performance. The first appointment a client

          had with Dr. RICHARD A. RYDZE typically included a discussion of the client's

          health symptoms. The discussions usually centered around issues of fatigue,

          appetite or diet, exercise or training, and mood or libido issues. At the first

consultation appointment, Dr. RICHARD A. RYDZE would listen to the client's story and then write the client a prescription for laboratory blood work to check the client's hormone levels. The client would then take the prescription to an independent laboratory and have the tests completed. Dr. RICHARD A. RYDZE would include a false diagnosis on the prescription, such as pituitary insufficiency, hormone imbalance, and/or adrenal insufficiency, so that the client's insurance would cover the cost of the blood work. Approximately ten days later, the client's laboratory blood results would be received by HSE and the client would return for a second appointment with Dr. RICHARD A. RYDZE. The cost of the initial appointment and the subsequent appointment to discuss the blood work was $150. Each additional follow up appointment was $75.00 per session.

d.     Dr. RICHARD A. RYDZE would frequently and falsely diagnose clients as having pituitary deficiency, hormone imbalance, or adrenal insufficiency, and then typically prescribe Sermorelin (GHRP 6), human growth hormone, anabolic steroids, and/or pregnenolone. Approximately six weeks later, the client would again obtain laboratory blood work via a prescription from Dr. RICHARD A. RYDZE, who would review the laboratory work to see if certain dosages needed to be adjusted.

e.     Dr. RICHARD A. RYDZE and JAMES HATZIMBES entered into a financial agreement to equally split the profits that were derived from the patients seen at HSE by Dr. RICHARD A. RYDZE. In addition, Dr. RICHARD A. RYDZE and JAMES HATZIMBES agreed to equally split all proceeds received from ANEWrx in the form of kickbacks for prescriptions that were written by Dr.

-10-

RICHARD A. RYDZE and referred to ANEWrx to be filled.

f.      The prescriptions written by Dr. RICHARD A. RYDZE and filled by ANEWrx
        were almost exclusively for anabolic steroids, human growth hormone, and
        hormone replacement products.  These prescriptions were not supported by
        appropriate medical testing and documentation and the supporting diagnosis was
        typically false.

g.      JAMES HATZIMBES was an anabolic steroid and human growth hormone
        patient of Dr. RICHARD A. RYDZE for performance enhancement and anti-
        aging purposes.

## OVERT ACTS

28.     In furtherance of the aforesaid conspiracy, and to effect the object of the
conspiracy, the defendants or one of their co-conspirators committed and caused to be committed
in the Western District of Pennsylvania and elsewhere, at least one of the following overt acts:

a.      On or about October 12, 2010, a confidential human source ("CHS-1") learned
        from a patient of Dr. RICHARD A. RYDZE that Dr. RICHARD A. RYDZE held
        "steroid clinics" at "Hats'" place approximately once per month.  "Hats" was later
        identified as JAMES HATZIMBES.  CHS-1 further learned that Dr. RICHARD
        A. RYDZE had an office in downtown Pittsburgh, and that CHS-1 could walk in
        and obtain a prescription for testosterone from Dr. RICHARD A. RYDZE.

b.      On or about October 14, 2010, CHS-1 was referred to DME Employee #1 and
        asked if he wanted human growth hormone or testosterone.  CHS-1 was informed
        that the next steroid clinic would be on Saturday, October 16, 2010.  CHS-1
        contacted DME Employee #1 by phone and asked DME Employee #1 about

-11-

obtaining testosterone and human growth hormone from Dr. RICHARD A.

RYDZE. CHS-1 was then scheduled to meet with DME Employee #1 and Dr.

RICHARD A. RYDZE at an anti-aging center located on Saw Mill Run, in

Pittsburgh, Pennsylvania, on Saturday, October 16, 2010.

c.      On or about October 16, 2010, CHS-1 met with DME Employee #1 and Dr.

RICHARD A. RYDZE at HSE. CHS-1 paid $75.00 cash for the appointment, and

received a prescription from Dr. RICHARD A. RYDZE for blood testing. Dr.

RICHARD A. RYDZE told CHS-1: "This should be covered by insurance. I just

put some diagnosis down, that should make it covered. And, um, ideally, Quest

Labs does the best hormones." Dr. RICHARD A. RYDZE further stated to CHS-

1: "Um, I mean growth is mainly a reparative hormone...I mean it doesn't make

you any stronger, bigger, faster...but it, it helps repair tendons, so, I have people

who are doing weights and that. Their muscles sometimes, ah, testosterone, the

muscles get too strong for the tendons. That's why these guys are all ripping their

tendons....Their tendons aren't strong enough for the muscle, it just rips it off the

bone. So enough growth is really, does, growth helps you sleep and you tend to

lose a little body fat with growth." CHS-1 was also scheduled for a follow-up

appointment with Dr. RICHARD A. RYDZE at HSE on October, 30, 2010.

d.      On or about October 30, 2010, CHS-1 met with DME Employee #1 and Dr.

RICHARD A. RYDZE at HSE. During this meeting CHS-1 informed Dr.

RICHARD A. RYDZE that he was interested in obtaining testosterone and human

growth hormone for body building purposes. Dr. RICHARD A. RYDZE

informed CHS-1 that they could try to get his testosterone level up to 500 or 600

-12-

using HCG, with a little bit of Arimidex. Dr. RICHARD A. RYDZE further
explained that CHS-1 might have to do multiple cycles of these drugs, at six
weeks per cycle. Dr. RICHARD A. RYDZE further explained that if CHS-1
wanted to raise his testosterone levels to 800, 900, or 1,000, he would probably
have to do it by way of a testosterone shot, or testosterone and pregnenolone in
one cream. Dr. RICHARD A. RYDZE further informed CHS-1 that "we usually
use a compound pharmacy, that'll ah, that people can get their cypionate there"
and "I'll give you the syringes if you need [them]."

e.     When CHS-1 asked Dr. RICHARD A. RYDZE if his insurance would cover his
prescriptions at the pharmacy, Dr. RICHARD A. RYDZE responded: "Well,
insurance isn't going to cover it, no matter where you go, because you're not
deficient. Unless you're under two fifty, they're not going to cover it." Dr.
RICHARD A. RYDZE then referred CHS-1 to ANEWrx to fill his prescription.

f.     Dr. RICHARD A. RYDZE provided CHS-1 with a written prescription for blood
work, and stated he would contact ANEWrx and order prescriptions of
testosterone, pregnenolone, and human growth hormone for CHS-1.

g.     On or about November 10, 2010, CHS-1 purchased the testosterone,
pregnenolone, and human growth hormone from ANEWrx, located on Parkway
View Drive, in Pittsburgh, Pennsylvania. CHS-1 received pregnenolone (100 mg)
capsules, 10 ML testosterone Cypionate 200 mg/ml oil injection solution, Tev-
Tropin 5 mg, 10 syringe BD, 3CC 23 gauge X1, ten needles, 18 gauge X 1.5, and
thirty syringe insulin 1cc 30 G X 5/16. The total cost for these items was $532.50.

h.     In January, 2011, CHS-1 used the prescription written by Dr. RICHARD A.

-13-

RYDZE to obtain a blood analysis at Quest Laboratory. CHS-1 then scheduled an appointment to meet with Dr. RICHARD A. RYDZE at HSE on Saturday, January 8, 2011. This appointment was later rescheduled to January 22, 2011 after Quest Laboratory advised that his blood work had not been completed, and therefore, a copy of the results had not been faxed to Dr. RICHARD A. RYDZE.

i.      On or about January 22, 2011, CHS-1 spoke by telephone with DME Employee #1 and Dr. RICHARD A. RYDZE. Dr. RICHARD A. RYDZE advised CHS-1 that he (Dr. RICHARD A. RYDZE) would mail a prescription for blood work to CHS-1, as well as add Vitamin B-12 injectables to CHS-1's testosterone, pregnenolone, and human growth hormone prescription at ANEWrx.

j.      Prior to February 2, 2011, CHS-1 received an envelope in the mail with a return address of "HSE ANTIAGING, 2851 Saw Mill Run, Pittsburgh, Pennsylvania, 15227." The envelope contained a prescription for CHS-1 written by Dr. RICHARD A. RYDZE, dated January 22, 2011, ordering blood testing for levels of free total testosterone, estrodial, Vitamin B-12, and pregnenolone. The prescription contained the listed diagnosis of androgen deficiency, fatigue, hormone imbalance, and adrenal insufficiency.

k.      On or about February 17, 2011, CHS-1 telephoned and requested that ANEWrx ship the prescriptions to his/her address. CHS-1 used a pre-paid credit card to pay $580.00 for the products and shipment.

l.      JAMES HATZIMBES and Dr. RICHARD A. RYDZE had a financial agreement to charge $75.00 for each visit scheduled with Dr. RICHARD A. RYDZE at HSE, which would be split 50/50 between Dr. RICHARD A. RYDZE and JAMES

-14-

HATZIMBES. They further agreed to split the proceeds from ANEWrx for
prescriptions referred to this pharmacy as well as all proceeds received from
Botox and Juvaderm patients.

m.    JAMES HATZIMBES was an anabolic steroid and human growth hormone
patient of Dr. RICHARD A. RYDZE. On numerous occassions Dr. RICHARD
A. RYDZE prescribed for JAMES HATZIMBES combinations of drugs
indicative of stacking. On or about May 11, 2009, Dr. RICHARD A. RYDZE
prescribed for JAMES HATZIMBES two vials of Tev-Tropin 5 mg. On or about
October 22, 2009, Dr. RICHARD A. RYDZE prescribed for JAMES
HATZIMBES fifteen Anastrozole 5 mg capsules, thirty Clomiphene Citrate 51
mg capsules, and thirty Vitamin B-12 1000 ml injectables. These prescriptions
were all filled at ANEWrx, however, corresponding commission reports prepared
by ANEWrx for Dr. RICHARD A. RYDZE indicate Dr. RICHARD A. RYDZE
did not receive a commission on the products he prescribed for JAMES
HATZIMBES.

n.    On or about March 23, 2010, Dr. RICHARD A. RYDZE prescribed for JAMES
HATZIMBES one vial of Sermorelin/GHRP 6, 3 mg, with five available refills,
and a topical cream containing DHEA 50 mg, Nandrotest 100, 100 mg injectable,
and Pregnenolone, 200 mg, also with five refills. This prescription was written on
a preprinted prescription form on ANEWrx letterhead. The prescription was
signed by Dr. RICHARD A. RYDZE and a hand-written note at the bottom of the
form read: "Remember he gets my price and requests delivery (need to call him)".
A corresponding ANEWrx commission report prepared for Dr. RICHARD A.

-15-

RYDZE for the month of March, 2010 shows Dr. RICHARD A. RYDZE did not receive a commission for the products he prescribed for JAMES HATZIMBES.

o.   JAMES HATZIMBES received prescriptions for anabolic steroids and/or human growth hormone from Dr. RICHARD A. RYDZE on numerous other occasions including: October 7, 2009, a prescription for 100mg Pregnenolone capsules with five refills; May 18, 2010, a prescription for 100 mg Testosterone cream with five refills; February 15, 2011, a prescription for one 3 mg vial of Sermorelin/GHRP 6 with five refills; and March 7, 2011, a prescription for 120 mg Testosterone cream, one unit of Tev-Tropin, one vial of Sermorelin/GHRP 6, and 150 mg Pregnenolone capsules, all with five refills. All of these prescriptions were filled at ANEWrx pharmacy. None of these prescriptions appeared on JAMES HATZIMBES' medication log or were reflected in his patient file maintained by Dr. RICHARD A. RYDZE and OHC. Furthermore, prescriptions were submitted to ANEWrx by Dr. RICHARD A. RYDZE for JAMES HATZIMBES on March 23, 2010, May 17, 2010, August 7, 2010, December 8, 2010, and December 30, 2010 with no corresponding office appointments, notations, or diagnosis to justify the prescriptions. A note in JAMES HATZIMBES' patient file maintained by OHC for a May 6, 2009 office visit indicated JAMES HATZIMBES was "here to discuss getting back into shape" and would "like to restart HGH and testosterone."

p.   In early 2007, Dr. RICHARD A. RYDZE met with Sadowski, President and co-owner of ANEWrx, and agreed that Dr. RICHARD A. RYDZE would be paid a commission on every prescription for human growth hormone, anabolic steroids,

-16-

thyroid products, topical creams, and bio-identical hormone replacement products that his patients filled at ANEWrx. Sadowski then provided Dr. RICHARD A. RYDZE with a list, detailing ANEWrx's price for each prescription. Sadowski and Dr. RICHARD A. RYDZE then agreed to mark up the price to Dr. RICHARD A. RYDZE's patients and that Sadowski would kick back the additional funds to Dr. RICHARD A. RYDZE. Thereafter, Dr. RICHARD A. RYDZE referred the vast majority of his patients at OHC and HSE to ANEWrx.

q.  ANEWrx maintained monthly billing reports documenting the names of patients referred by Dr. RICHARD A. RYDZE; the corresponding prescriptions from Dr. RICHARD A. RYDZE for various compounded products; the amount of prescription products dispensed, including anabolic steroids and human growth hormone; the price ANEWrx charged Dr. RICHARD A. RYDZE; the amount the patient paid for the product; and the amount of the kickback due to Dr. RICHARD A. RYDZE.

r.  Commission reports prepared by ANEWrx for Dr. RICHARD A. RYDZE on August 15, 2007, September 6, 2007, November 9, 2007, December 19, 2007, January 14, 2008, February 29, 2008, April 8, 2008, May 16, 2008, June 10, 2008, July 14, 2008, August 14, 2008, September 2, 2008, October 1, 2008, November 3, 2008, January 7, 2009, February 9, 2009, March 2, 2009, April 6, 2009, May 4, 2009, July 2, 2009, August 4, 2009, September 2, 2009, November 2, 2009, December 1, 2009, January 5, 2010, February 1, 2010, March 2, 2010, April 6, 2010, June 1, 2010, July 1, 2010, August 2, 2010, September 1, 2010, October 4, 2010, December 1, 2010, and January 4, 2011 show a combined total commission

-17-

of $301,407.74 paid to Dr. RICHARD A. RYDZE by ANEWrx.

s.      Dr. RICHARD A. RYDZE was paid monthly by ANEWrx for the mark-up Dr.

RICHARD A. RYDZE placed on prescriptions for his patients.  Between January

1, 2008 and December 31, 2010, ANEWrx issued one check payable to Dr.

RYDZE in the amount of $6,845.33 and three checks payable to Optimal Health

Center totaling $25,395.50.  In addition, there were fourteen deposits from two

separate ANEWrx accounts to an Optimal Health Center LLC account at Dollar

Bank totaling $146,465.59.  The payments were originally made to Dr. RICHARD

A. RYDZE directly but were changed to OHC per the request of Dr. RICHARD

A. RYDZE.

t.      In addition, ANEWrx provided Dr. RICHARD A. RYDZE with $3,060.00 worth

of depo medrol injectable 80 mg dosages, with a corticosteroid, on September 20,

2010, December 23, 2010, and January 21, 2011.  Sadowski then subtracted the

cost of this product from the payments ANEWrx made to Dr. RICHARD A.

RYDZE for prescription referrals.

All in violation of Title 21, United States Code, Sections 846 and 841(a)(1) & (b)(1)(E).

-18-

## COUNTS 2-3

### (Distributing Controlled Substances - Anabolic Steroids, in violation of 21 U.S.C. §841(a)(1) & (b)(1)(E) and 18 U.S.C. § 2)

The Grand Jury further charges:

29.     Paragraphs 1 through 23 of the General Allegations and paragraphs 24 and 26

through 28 are incorporated as though realleged in their entirety herein.

30.     On or about the dates listed for each count, in Pittsburgh, Pennsylvania, in the

Western District of Pennsylvania, and elsewhere, defendants identified in each count knowingly

and intentionally distributed one or more Schedule III controlled substances outside the scope of

professional practice and not for a legitimate medical purpose, as set forth below:

| COUNT | DATE OF PRESCRIPTION | DEFENDANT | DRUGS |
|---|---|---|---|
| 2 | 11/9/10 | Dr. RICHARD A. RYDZE and JAMES HATZIMBES | Testosterone Cypionate and Pregnenolone (to CHS-1) |
| 3 | 2/17/11 | Dr. RICHARD A. RYDZE and JAMES HATZIMBES | Testosterone Cypionate and Pregnenolone (to CHS-1) |

All in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(E) and

Title 18, United States Code, Section 2.

## COUNT 4

**(Conspiracy to Unlawfully Distribute Human Growth Hormone,
in violation of 18 U.S.C. § 371)**

The Grand Jury further charges:

31.     Paragraphs 1 through 23 of the General Allegations are incorporated as though

realleged in their entirety herein.

32.     On a date unknown to the Grand Jury, but at least as early as from in or about

September 2007, and continuing through on or about March 31, 2011, in Pittsburgh,

Pennsylvania, in the Western District of Pennsylvania, and elsewhere, the defendants,

RICHARD A. RYDZE, and JAMES HATZIMBES, did knowingly and willfully combine,

conspire, confederate and agree with each other, and with others known and unknown to the

grand jury, to commit certain offenses against the United States, namely to knowingly distribute

and possess with the intent to distribute human growth hormone, for a use in humans other than

the treatment of a disease or other recognized medical condition, where such use had been

authorized by the Secretary of Health and Human Services under 21 U.S.C. § 355 and was

pursuant to the order of a physician, in violation of Title 21, United States Code, Section 333(e).

### OBJECT OF THE CONSPIRACY

33.     It was the object of the conspiracy for the defendants and their

co-conspirators to unjustly enrich themselves by marketing and causing the distribution of human

growth hormone for unauthorized uses such as weight loss, anti-aging, body building, and

athletic performance enhancement.

### MANNER AND MEANS

34.     The manner and means employed by the defendants to effect the object of

-20-

the conspiracy included the following:

a.    Dr. RICHARD A. RYDZE saw patients at Optimal Health Center L.L.C., where
      he prescribed human growth hormone to patients in an off label manner. Dr.
      RICHARD A. RYDZE then referred these patients to ANEWrx, where he had a
      kickback arrangement with the owner, to fill their prescriptions.

b.    Dr. RICHARD A. RYDZE also saw patients at HSE, co-owned by JAMES
      HATZIMBES, where they conspired to distribute human growth hormone for off-
      label and anti-aging purposes.

c.    Paragraphs 27c through 27g are incorporated as though realleged in their entirety
herein.

## OVERT ACTS

35.    In furtherance of the aforesaid conspiracy, and to effect the object of the
conspiracy, the defendants or one of their co-conspirators committed and caused to be committed
in the Western District of Pennsylvania and elsewhere, at least one of the following overt acts:

a.    Paragraph 28 is incorporated as though realleged in its entirety herein.

b.    On or about January 8, 2011, Dr. RICHARD A. RYDZE saw patients at HSE
      from 8:30 am to 3:30 pm. Twelve out of thirteen appointments scheduled were
      for human growth hormone.

c.    On or about October 13, 2010, Confidential Human Source 2 ("CHS-2") called
      OHC and spoke with OHC Employee #1, a registered nurse employed by Dr.
      RICHARD A. RYDZE. CHS-2 told OHC Employee #1 that he/she had a friend
      who obtained human growth hormone from Dr. RICHARD A. RYDZE, and CHS-
      2 would like some as well to assist with combating fatigue. During this

-21-

conversation, OHC Employee #1 told CHS-2 "I'll do some blood work. I'll, I'll send you a script to get some blood work done." OHC Employee #1 explained that most people who receive growth hormone have some type of physical issues, meaning they are slow healers and may have had some type of surgical repair or orthopedic care. OHC Employee #1 said: "As we age, as we age, growth hormone ah is, becomes less, and that is in fact, what keeps us, gives us our food." OHC Employee #1 then stated she would mail a prescription for blood work to CHS-2. "Once it's all received, then I will give you a call, and um, you know, um go from there. Alright. I'll (unintelligible) and look at them and the doctor will see you and give you some, maybe you know, suggestion and/or possibly growth hormones."

d.    On or about November 11, 2010, CHS-2 met with Dr. RICHARD A. RYDZE at OHC. CHS-2 paid $250.00 cash for the appointment, and questioned why insurance would not cover it. CHS-2 then inquired about obtaining human growth hormone from Dr. RICHARD A. RYDZE for the purposes of combating fatigue and losing weight. Dr. RICHARD A. RYDZE reviewed CHS-2's laboratory blood results and asked CHS-2 how much weight he/she wanted to lose. CHS-2 advised that he/she currently weighed approximately 142 pounds, but would like to get down to 125 pounds. Dr. RICHARD A. RYDZE advised that human growth hormone could help accomplish that goal.

e.    Dr. RICHARD A. RYDZE provided CHS-2 with a written prescription for follow-up blood work to be conducted in six to eight weeks, and advised he would contact ANEWrx and order renewable prescriptions of human growth hormone for CHS-2.

-22-

f.      On or about November 16, 2010, CHS-2 purchased the human growth hormone

from ANEWrx.  CHS-2 received two packs of Tev-Tropin 5 mg, and 30 insulin

syringes, as prescribed by Dr. RICHARD A. RYDZE.  The total cost for these

items was $427.50, which CHS-2 paid for with a pre-paid Visa card.

All in violation of Title 18, United States Code, Section 371.

## COUNTS 5-8

**(Unlawfully Distributing Human Growth Hormone, in violation of
21 U.S.C. § 333(e) and 18 U.S.C. § 2)**

The Grand Jury further charges:

36.     Paragraphs 1 through 23 of the General Allegations are incorporated as though

realleged in their entirety herein.

37.     On or about the dates listed for each count, in Pittsburgh, Pennsylvania, in the

Western District of Pennsylvania, and elsewhere, the defendants identified in each count, did

knowingly distribute and possess with the intent to distribute human growth hormone, for use in

humans other than for the treatment of a disease or other recognized medical condition, where

such use had been authorized by the Secretary of Health and Human Services under 21 U.S.C. §

355 and was pursuant to the order of a physician:

| COUNT | DATE OF PRESCRIPTION | DEFENDANT | DRUGS |
|---|---|---|---|
| 5 | Between 11/11/10 and 11/16/10 | Dr. RICHARD A. RYDZE | Tev-Tropin (to CHS-2) |
| 6 | 3/7/11 | Dr. RICHARD A. RYDZE | Tev-Tropin (to James Hatzimbes) |
| 7 | 11/9/10 | Dr. RICHARD A. RYDZE and JAMES HATZIMBES | Tev- Tropin (to CHS-1) |

-23-

| 8 | 2/17/11 | Dr. RICHARD A. RYDZE and JAMES HATZIMBES | Tev- Tropin (to CHS-1) |

All in violation of Title 21, United States Code, Section 333(e) and Title 18, United States Code, Section 2.

## COUNT 9

**(Health Care Fraud, in violation of 18 U.S.C. § 1347)**

The Grand Jury further charges:

38.     Paragraphs 1 through 23 of the General Allegations are incorporated as though realleged in their entirety herein.

39.     From in or about September 4, 2007 through on or about October 6, 2010, in the Western District of Pennsylvania, and elsewhere, Defendant RICHARD A. RYDZE knowingly and willfully executed, and attempted to execute, a scheme and artifice to defraud a health care benefit program, and to obtain, by means of false and fraudulent pretenses, representations and promises described herein, money and property owned by, and under the custody and control of, a health care benefit program, in connection with the delivery of or payment for health care benefits, items and services.

40.     It was part of the scheme and artifice to defraud that Dr. RICHARD A. RYDZE submitted medical claims to Highmark Insurance wherein he diagnosed more than 90 adult patients with Pituitary Dwarfism.  However, according to Pennsylvania Department of Motor Vehicles records, all of the individuals diagnosed by Dr. RICHARD A. RYDZE with Pituitary Dwarfism are above five feet tall, and at least 40 of the 90 patients are taller than five feet nine inches.  None of the 90 patients displayed apparent physical facial characteristics of dwarfism in

-24-

their driver's license photographs.

41.     It was part of the scheme and artifice to defraud that Dr. RICHARD A. RYDZE

knowingly submitted medical claims to Highmark Insurance for the following individuals under

the wrong insurance code 253.3, Pituitary Dwarfism:

    a.     James Hatzimbes, age 40, height 6'0";

    b.     Patient AJB, age 61, height 5'11;

    c.     Patient DMB, age 41, height 5'6";

    d.     Patient BAC, age 48, height 5'4";

    e.     Patient MJH, age 39, height 5'6";

    f.     Patient IM, age 70, height 5'6";

    g.     Patient DCW, age 43, height 5'10";

    h.     Patient CG, age 43, height 5'11";

    i.     Patient FC, age 58, height 5'9".

42.     It was further part of the scheme and artifice to defraud that OHC submitted a

claim to Highmark Insurance for James Hatzimbes for an office visit on May 6, 2009, wherein

Dr. RICHARD A. RYDZE diagnosed James Hatzimbes with Pituitary Dwarfism.  No

prescriptions were billed to Highmark Insurance that corresponded to this appointment date or

diagnosis.   However, a financial analysis of James Hatzimbes' Citizens Bank account

#XXXXXX7324 indicated he made thirteen cash payments to ANEWrx between December 4,

2009 and September 30, 2010, totaling $3,575.00.

43.     It was further part of the scheme and artifice to defraud that patient AJB was

diagnosed by Dr. RICHARD A. RYDZE as having  Pituitary Dwarfism on December 18, 2008,

despite being five feet eleven inches in height and 61 years old.  AJB is a former karate

-25-

competitor and bodybuilder and had no physical characteristics consistent with dwarfism.

Between May 22, 2007 and January 31, 2012, Dr. RICHARD A. RYDZE prescribed over 196

various prescriptions for Patient AJB, including fourteen prescriptions for testosterone cypionate.

Seven of the testosterone cypionate prescriptions were prescribed to Patient AJB before Dr.

RICHARD A. RYDZE diagnosed AJB with Pituitary Dwarfism.  In addition, 25 claims were

submitted to Highmark insurance for Patient AJB for the prescription drug Arimidex.  Arimidex

is the trade name for Anastrozole by AstraZeneca, and is used to treat breast cancer after surgery

and for mestastes in both pre and post-menopausal women.  Anastrozole is an aromatase

inhibitor, which means that it interrupts a critical step in the body's synthesis of estrogen.  While

officially indicated for women, this drug has proven effective in the off-label use of reducing

estrogen in men.  Excess estradiol in men can cause benign prostatic hyperplasia, gynecomastia,

and symptoms of hypogonadism.  Some athletes and bodybuilders will also use Anastrozole as

part of their steroid cycle to reduce and prevent symptoms of excess estrogen, including

gynecomastia and water retention.

44.    It was further part of the scheme and artifice to defraud that claims were

submitted to Highmark Insurance for patient DMB wherein Dr. RICHARD A. RYDZE

diagnosed the patient as having Pituitary Dwarfism on September 29, 2008, November 10, 2008,

March 25, 2009, April 24, 2009, June 11, 2009, and March 8, 2010.  DMB was five feet six

inches in height and 41 years old.  Dr. RICHARD A. RYDZE prescribed numerous medications

to Patient DMB, to include various thyroid medications and human growth hormone.  Patient

DMB received 23 prescriptions for Tev-Tropin, which were submitted to and paid by Highmark

Insurance.

45.    It was further part of the scheme and artifice to defraud that patient BAC was

-26-

diagnosed by Dr. RICHARD A. RYDZE as having Pituitary Dwarfism on July 15, 2009 and

August 10, 2009, despite her height of five feet four inches at 48 years of age. Dr. RICHARD A.

RYDZE prescribed thyroid medication, and claims for these prescriptions were submitted and

paid by Highmark Insurance. Pennsylvania Department of Labor and Industry records indicate

Patient BAC was employed by DME in 2010.

46.     It was further part of the scheme and artifice to defraud that patient MJH was

diagnosed by Dr. RICHARD A. RYDZE as having Pituitary Dwarfism on February 26, 2009,

despite being five feet six inches in height and 39 years old. There are no prescriptions billed to

Highmark that correspond to the February 26, 2009 Pituitary Dwarfism diagnosis for Patient

MJH. However, Dr. RICHARD A. RYDZE prescribed the drug Arimidex for Patient MJH on

December 14, 2009 and January 7, 2010 which was submitted to and paid by Highmark

Insurance.

47.     It was further part of the scheme and artifice to defraud that patient IM was

diagnosed by Dr. RICHARD A. RYDZE with Pituitary Dwarfism on April 1, 2009, June 3, 2009,

June 29, 2009, October 13, 2009, December 2, 2009, and April 22, 2010 despite her being five

feet six inches tall and 70 years of age. Dr. RICHARD A. RYDZE prescribed Tev-Tropin human

growth hormone for Patient IM on October 5, 2009, January 4, 2010, February 18, 2010, March

30, 2010, June 17, 2010, and August 18, 2010. These prescriptions were all filled through a

mail-order service provided by the Accredo Health Group Pharmacy in Memphis, Tennessee.

All of these prescriptions were submitted to and paid by Highmark Insurance.

48.     It was further part of the scheme and artifice to defraud that patient DCW was

diagnosed by Dr. RICHARD A. RYDZE as having Pituitary Dwarfism on April 22, 2008 and

February 11, 2009, despite being five feet ten inches in height and 43 years old. Insurance claims

-27-

were submitted to and paid by Highmark Insurance for both office appointments.

49.     It was further part of the scheme and artifice to defraud that patient CG was diagnosed by Dr. RICHARD A. RYDZE as having Pituitary Dwarfism on July 2, 2010, despite being five feet eleven inches in height and 43 years old.  An insurance claim was submitted to and paid by Highmark Insurance for the office visit.

50.     Dr. RICHARD A. RYDZE, having knowingly and willfully executed and attempted to execute the scheme and artifice to defraud the health care benefit program described above, and to obtain money, by means of the false and fraudulent pretenses, representations and promises described above, did so execute and attempt to execute the scheme by causing claims to be submitted to Highmark Insurance, all for the purpose of executing said scheme and artifice.

All in violation of Title 18, United States Code, Section 1347.

### COUNT 10

**(Conspiracy to Distribute Controlled Substances in violation of 21 U.S.C. § 846)**

The Grand Jury further charges:

51.     Paragraphs 1 through 3 and 12 of the General Allegations are incorporated as though realleged in their entirety herein.

52.     From on or about March 28, 2007, to on or about January 6, 2012, in the Western District of Pennsylvania, Dr. RICHARD A. RYDZE and WILLIAM ZIPF, defendants herein, knowingly and intentionally combined, conspired, confederated and agreed together and with each other, and with other persons known and unknown to the Grand Jury to possess with the intent to distribute and distribute a quantity of Oxycodone, Oxymorphone, Oxycontin, and Opana, Schedule II controlled substances, in violation of Title 21, United States Code, Section 841(a)(1) & (b)(1)(C).

-28-

## MANNER AND MEANS

53.     WILLIAM ZIPF and Dr. RICHARD A. RYDZE were friends who knew each other for many years.

54.     Beginning in 2007, Dr. RICHARD A. RYDZE prescribed prescription pain killers for WILLIAM ZIPF, including but not limited to Oxycodone, Oxymorphone, Oxycontin, and Opana, all Schedule II controlled substances.

55.     Later in 2007, WILLIAM ZIPF requested that Dr. RICHARD A. RYDZE put ZIPF's prescriptions for Oxycodone, Oxycontin, Oxymorphone, Oxycontin, and Opana in the names of other individuals, including WILLIAM ZIPF's family members.  Dr. RICHARD A. RYDZE agreed to write these prescriptions in other individuals' names.

56.     Dr. RICHARD A. RYDZE wrote these prescriptions for ZIPF in other peoples' names outside the usual course of professional practice and not for a legitimate medical purpose. Dr. RICHARD A. RYDZE did not examine or consult with WILLIAM ZIPF's family members before writing these prescriptions, and understood that the controlled substances would not be used for legitimate medical treatment for those individuals.

57.     At times, Dr. RICHARD A. RYDZE wrote more than one prescription for WILLIAM ZIPF at the same time or left required fields in these prescriptions blank, which allowed WILLIAM ZIPF to fill them in at a later date.

58.     The prescriptions were filled at numerous different Pittsburgh-area pharmacies in order to avoid detection.

59.     WILLIAM ZIPF distributed a quantity of the Oxycodone, Oxymorphone, Oxycontin, and Opana to other persons.

## OVERT ACTS

-29-

60.     On or about the dates listed in the chart below, in the Western District of

Pennsylvania, WILLIAM ZIPF filled the following prescriptions written by Dr. RICHARD A.

RYDZE:

| Overt Act | Patient | Rx Date | Drug | # Tablets | Pharmacy |
|---|---|---|---|---|---|
| 1 | WILLIAM ZIPF | 3/28/2007 | Oxycodone HCL | 60 | Eckerd Pharmacy (now Rite Aid # 10926) |
| 2 | Relative # 1 | 5/4/2007 | Oxycodone HCL 40 mg ER | 60 | Rite Aid #10906 |
| 3 | Relative # 1 | 7/25/2007 | Oxycodone HCL 40 mg ER | 60 | Rite Aid #10906 |
| 4 | Relative # 1 | 9/4/2007 | Oxycodone HCL 40 mg ER | 60 | Rite Aid #10906 |
| 5 | Relative # 1 | 10/24/2007 | Oxycodone HCL 40 mg ER | 60 | Rite Aid #10906 |
| 6 | WILLIAM ZIPF | 12/6/2007 | Oxycontin 40 mg | 60 | Giant Eagle Pharmacy 4 |
| 7 | WILLIAM ZIPF | 2/12/2008 | Oxycontin 40 mg | 60 | Giant Eagle Pharmacy 4 |
| 8 | Relative # 1 | 2/13/2008 | Oxycodone HCL 40 mg ER | 60 | Rite Aid #10906 |
| 9 | WILLIAM ZIPF | 3/6/2008 | Oxycontin 40 mg | 60 | Giant Eagle Pharmacy 4 |
| 10 | Relative # 2 | 3/7/2008 | Oxycontin 40 mg | 60 | Rite Aid # 10933 |
| 11 | Relative # 1 | 3/19/2008 | Oxycontin 40 mg tablet | 60 | Rite Aid #10906 |
| 12 | Relative # 2 | 4/9/2008 | Oxycontin 40 mg | 60 | Eckard Pharmacy (now Rite Aid # 10956) |
| 13 | WILLIAM ZIPF | 5/7/2008 | Oxycontin 40 mg | 60 | Giant Eagle Pharmacy 4 |
| 14 | Relative # 2 | 5/8/2008 | Oxycontin 40 mg | 60 | Rite Aid # 10933 |
| 15 | Relative # 1 | 5/22/2008 | Oxycontin 40 mg | 60 | Rite Aid #10906 |
| 16 | Relative # 2 | 10/17/2008 | Oxycontin 40 mg | 60 | Rite Aid # 10933 |
| 17 | WILLIAM ZIPF | 10/17/2008 | Oxycontin 40 mg | 60 | Rite Aid # 269 |
| 18 | Relative # 2 | 11/24/2008 | Oxycontin 40 mg | 60 | Rite Aid # 10933 |
| 19 | WILLIAM ZIPF | 11/24/2008 | Oxycontin 40 mg | 60 | Eckerd Pharmacy (now Rite Aid # 10926) |
| 20 | Relative # 1 | 1/2/2009 | Oxycontin 40 mg | 60 | Rite Aid #10906 |
| 21 | WILLIAM ZIPF | 1/7/2009 | Oxycodone HCL 40 mg | 60 | Giant Eagle Pharmacy 4 |
| 22 | Relative # 2 | 1/13/2009 | Oxycontin 40 mg | 60 | Rite Aid # 10933 |
| 23 | WILLIAM ZIPF | 2/10/2009 | Oxycontin 40 mg | 60 | Giant Eagle Pharmacy 4 |
| 24 | Relative # 2 | 3/2/2009 | Oxycontin 40 mg | 60 | Rite Aid # 10933 |
| 25 | WILLIAM ZIPF | 3/23/2009 | Oxycontin 40 mg | 60 | Giant Eagle Pharmacy 4 |
| 26 | Relative # 2 | 3/30/2009 | Oxycontin 40 mg | 60 | Rite Aid # 10933 |
| 27 | Relative # 1 | 3/30/2009 | Oxycontin 40 mg | 60 | Rite Aid #10906 |
| 28 | Relative # 2 | 4/15/2009 | Oxycontin 40 mg | 60 | Rite Aid # 10933 |
| 29 | WILLIAM ZIPF | 4/16/2009 | Oxycontin 40 mg | 60 | Eckerd Pharmacy (now Rite Aid # 10926) |
| 30 | Relative # 1 | 4/28/2009 | Oxycontin 40 mg | 60 | Rite Aid #10906 |

-30-

| Overt Act | Patient | Rx Date | Drug | # Tablets | Pharmacy |
|---|---|---|---|---|---|
| 31 | WILLIAM ZIPF | 5/11/2009 | Oxycontin 40 mg | 60 | Giant Eagle Pharmacy 4 |
| 32 | Relative # 2 | 5/12/2009 | Oxycontin 40 mg | 60 | Rite Aid # 10933 |
| 33 | Relative # 1 | 5/26/2009 | Oxycontin 40 mg | 60 | Johnson's Pharmaceutical Services |
| 34 | WILLIAM ZIPF | 6/3/2009 | Oxycontin 40 mg | 60 | Giant Eagle Pharmacy 4 |
| 35 | Relative # 3 | 6/9/2009 | Oxycontin 40 mg | 60 | Med-Fast Pharmacy, 3125 Banksville Road |
| 36 | Relative # 2 | 6/10/2009 | Oxycontin 40 mg | 60 | Rite Aid # 10933 |
| 37 | Relative # 1 | 6/16/2009 | Oxycontin 40 mg | 60 | Rite Aid #10906 |
| 38 | WILLIAM ZIPF | 7/2/2009 | Oxycontin 40 mg | 60 | Giant Eagle Pharmacy 14 |
| 39 | Relative # 1 | 7/6/2009 | Oxycontin 40 mg | 60 | Johnson's Pharmaceutical Services |
| 40 | Relative # 2 | 7/14/2009 | Oxycontin 40 mg | 60 | Rite Aid # 10933 |
| 41 | Relative # 3 | 7/21/2009 | Oxycontin 40 mg | 60 | Med-Fast Pharmacy, 3125 Banksville Road |
| 42 | WILLIAM ZIPF | 8/3/2009 | Oxycontin 40 mg | 60 | Giant Eagle Pharmacy 4 |
| 43 | Relative # 1 | 8/11/2009 | Oxycontin 40 mg | 60 | Johnson's Pharmaceutical Services |
| 44 | Relative # 2 | 8/12/2009 | Oxycontin 40 mg | 60 | Rite Aid # 10933 |
| 45 | WILLIAM ZIPF | 11/7/2009 | Oxycontin 40 mg | 60 | Giant Eagle Pharmacy 4 |
| 46 | Relative # 2 | 11/17/2009 | Oxycontin 40 mg | 60 | Rite Aid # 10933 |
| 47 | Relative # 3 | 11/20/2009 | Oxycontin 40 mg | 60 | Med-Fast Pharmacy, 3125 Banksville Road |
| 48 | Relative # 1 | 11/24/2009 | Oxycontin 40 mg | 60 | Rite Aid #10906 |
| 49 | WILLIAM ZIPF | 12/7/2009 | Oxycontin 40 mg | 60 | Giant Eagle Pharmacy 4 |
| 50 | Relative # 2 | 12/16/2009 | Oxycontin 40 mg | 60 | Rite Aid # 10933 |
| 51 | WILLIAM ZIPF | 1/4/2010 | Oxycontin 40 mg | 60 | Giant Eagle Pharmacy 4 |
| 52 | Relative # 2 | 1/22/2010 | Oxycontin 40 mg | 60 | Rite Aid # 10933 |
| 53 | Relative # 1 | 2/12/2010 | Oxycontin 40 mg | 60 | Rite Aid #10906 |
| 54 | Relative # 3 | 2/15/2010 | Oxycontin 40 mg | 60 | Med-Fast Pharmacy, 3125 Banksville Road |
| 55 | WILLIAM ZIPF | 2/16/2010 | Oxycontin 40 mg | 60 | Rite Aid # 4783 |
| 56 | Relative # 2 | 2/26/2010 | Oxycontin 40 mg | 60 | Rite Aid # 10933 |
| 57 | WILLIAM ZIPF | 8/1/2010 | Oxycontin 40 mg | 60 | Eckerd Pharmacy (now Rite Aid # 10906) |
| 58 | Relative # 2 | 9/2/2010 | Oxycontin 40 mg | 60 | Rite Aid # 10933 |
| 59 | WILLIAM ZIPF | 9/29/2010 | Oxycontin 40 mg | 60 | Eckerd Pharmacy (now Rite Aid # 10906) |
| 60 | Relative # 1 | 10/16/2010 | Oxycontin 40 mg | 60 | Rite Aid #10906 |
| 61 | Relative # 2 | 11/3/2010 | Oxycontin 40 mg | 60 | Rite Aid # 10933 |
| 62 | WILLIAM ZIPF | 11/14/2010 | Oxycontin 40 mg | 60 | Giant Eagle Pharmacy 4 |

| Overt Act | Patient | Rx Date | Drug | # Tablets | Pharmacy |
|---|---|---|---|---|---|
| 63 | Relative # 2 | 11/30/2010 | Opana ER 40 mg | 60 | Rite Aid # 10933 |
| 64 | Relative # 3 | 11/30/2010 | Oxymorphone ER 40mg | 60 | Med-Fast Pharmacy, 3125 Banksville Road |
| 65 | Relative # 1 | 12/7/2010 | Opana ER 40 mg | 60 | Rite Aid # 4783 |
| 66 | WILLIAM ZIPF | 12/11/2010 | Oxymorphone ER 40mg | 60 | Eckerd Pharmacy (now Rite Aid # 10942) |
| 67 | Relative # 2 | 12/27/2010 | Opana ER 40 mg | 60 | Rite Aid # 4783 |
| 68 | Relative # 3 | 1/2/2011 | Oxymorphone ER 40mg | 60 | Med-Fast Pharmacy, 3125 Banksville Road |
| 69 | Relative # 1 | 1/24/2011 | Opana ER 40 mg | 60 | Rite Aid # 4783 |
| 70 | Relative # 2 | 1/25/2011 | Opana ER 40 mg | 60 | Rite Aid # 10933 |
| 71 | Relative # 2 | 3/8/2011 | Opana ER 40 mg | 60 | Rite Aid # 10933 |
| 72 | Relative # 1 | 3/8/2011 | Opana ER 40 mg | 60 | Rite Aid # 4783 |
| 73 | Relative # 2 | 3/31/2011 | Opana ER 40 mg | 60 | Rite Aid # 10933 |
| 74 | Relative # 1 | 4/6/2011 | Opana ER 40 mg | 60 | Rite Aid # 4783 |
| 75 | Relative # 1 | 5/2/2011 | Opana ER 40 mg | 60 | Rite Aid # 4783 |
| 76 | WILLIAM ZIPF | 5/9/2011 | Opana ER 40 mg | 60 | Rite Aid # 10931 |
| 77 | Relative # 2 | 5/13/2011 | Opana ER 40 mg | 60 | Rite Aid # 10933 |
| 78 | Relative # 2 | 6/10/2011 | Opana ER 40 mg | 60 | Rite Aid # 10933 |
| 79 | Relative # 1 | 6/11/2011 | Opana ER 40 mg | 60 | Rite Aid # 4783 |
| 80 | WILLIAM ZIPF | 6/17/2011 | Opana ER 40 mg | 60 | Rite Aid # 4783 |
| 81 | Relative # 1 | 7/6/2011 | Opana ER 40 mg | 60 | Rite Aid # 4783 |
| 82 | Relative # 2 | 7/11/2011 | Opana ER 40 mg | 60 | Rite Aid # 10933 |
| 83 | WILLIAM ZIPF | 7/20/2011 | Opana ER 40 mg | 60 | Rite Aid # 4783 |
| 84 | Relative # 1 | 8/5/2011 | Opana ER 40 mg | 60 | Rite Aid # 10942 |
| 85 | Relative # 2 | 8/22/2011 | Opana ER 40 mg | 60 | Rite Aid # 10933 |
| 86 | WILLIAM ZIPF | 8/24/2011 | Opana ER 40 mg | 60 | Rite Aid # 10926 |
| 87 | WILLIAM ZIPF | 8/25/2011 | Oxycodone HCL 30 mg | 100 | Walgreens # 11296 |
| 88 | Relative # 1 | 9/3/2011 | Opana ER 40 mg | 60 | Rite Aid # 4783 |
| 89 | Relative # 2 | 9/10/2011 | Opana ER 40 mg | 60 | Rite Aid # 10933 |
| 90 | Relative # 1 | 9/16/2011 | Oxycodone HCL 30 mg | 100 | Rite Aid # 10906 |
| 91 | WILLIAM ZIPF | 9/23/2011 | Opana ER 40 mg | 60 | Walgreens # 11296 |
| 92 | Relative # 2 | 9/30/2011 | Opana ER 40 mg | 60 | Rite Aid # 10942 |
| 93 | WILLIAM ZIPF | 9/30/2011 | Opana ER 40 mg | 60 | Rite Aid # 10942 |
| 94 | Relative # 1 | 10/2/2011 | Opana ER 40 mg | 60 | Rite Aid # 10931 |
| 95 | Relative # 2 | 10/6/2011 | Opana ER 40 mg | 60 | Rite Aid # 10933 |
| 96 | WILLIAM ZIPF | 10/6/2011 | Oxycodone HCL 30 mg | 100 | Rite Aid # 10926 |
| 97 | Relative # 1 | 10/11/2011 | Oxycodone HCL 30 mg | 100 | Rite Aid #10906 |
| 98 | Relative # 2 | 10/17/2011 | Oxycodone 30 mg | 100 | Rite Aid # 10906 |

-32-

| Overt Act | Patient | Rx Date | Drug | # Tablets | Pharmacy |
|---|---|---|---|---|---|
| 99 | Relative # 2 | 10/28/2011 | Oxycodone 30 mg | 100 | Rite Aid # 10933 |
| 100 | WILLIAM ZIPF | 11/1/2011 | Opana ER 40 mg | 60 | Walgreens # 11296 |
| 101 | Relative # 1 | 11/3/2011 | Opana ER 40 mg | 60 | Rite Aid # 4783 |
| 102 | Relative # 1 | 11/5/2011 | Oxycodone HCL 30 mg | 100 | Walgreens #11296 |
| 103 | Relative # 2 | 11/10/2011 | Opana ER 40 mg | 60 | Rite Aid # 10933 |
| 104 | WILLIAM ZIPF | 11/25/2011 | Opana ER 40 mg | 60 | Walgreens # 11296 |
| 105 | Relative # 1 | 12/5/2011 | Opana ER 40 mg | 60 | Rite Aid # 4783 |
| 106 | Relative # 2 | 12/12/2011 | Opana ER 40 mg | 60 | Rite Aid # 10942 |
| 107 | Relative # 1 | 1/3/2012 | Oxycodone HCL 30 mg | 100 | Rite Aid # 4783 |
| 108 | WILLIAM ZIPF | 1/6/2012 | Oxycodone HCL 30 mg | 100 | Walgreens # 09187 |

All in violation of Title 21, United States Code, Section 846.

## COUNTS 11-138

**(Acquiring and Obtaining Possession of a Controlled Substance by Misrepresentation, Fraud, Forgery, Deception and Subterfuge, in violation of 21 U.S.C. § 843(a)(3))**

The Grand Jury further charges:

61.     Paragraphs 1 through 3 and 12 of the General Allegations are incorporated as though realleged in their entirety herein.

62.     From on or about February 4, 2005, through on or about October 18, 2011, in the Western District of Pennsylvania, Dr. RICHARD A. RYDZE, Defendant herein, knowingly and intentionally obtained and acquired possession of Hydrocodone-Acetaminophen 7.5-750, a Schedule III controlled substance, by misrepresentation, fraud, forgery, deception, and subterfuge, in violation of Title 21, United States Code, Section 843(a)(3).

63.     It was part of the scheme for Dr. RICHARD A. RYDZE to obtain over 21,000 pills of Hydrocodone-Acetaminophen 7.5-750, a Schedule III controlled substance commonly referred to by the name "Vicodin ES," by calling in over 200 prescriptions to Pittsburgh-area

-33-

pharmacies.

64.     In order to obtain the Hydrocodone-Acetaminophen 7.5-750, Dr. RICHARD A.

RYDZE fraudulently and without lawful authority used the name and DEA registration number

that was issued to another physician, "AY," in order to authorize the prescriptions.  Dr.

RICHARD A. RYDZE  did so without the consent or knowledge of "AY."

65.     Using AY's name and DEA registration number, Dr. RICHARD A. RYDZE

fraudulently represented that the prescriptions were for a relative of his.

66.     Despite the fact that Dr. RICHARD A. RYDZE's relative died on or about April

8, 2010, Dr. RICHARD A. RYDZE continued to authorize prescriptions, using AY's name and

DEA registration number, for the deceased relative.

67.     When AY discovered that his name and DEA registration number had been used

for this purpose, Dr. RICHARD A. RYDZE falsely stated to AY that the drugs were for a

different relative of his and he believed his own name had been used to authorize those

prescriptions.

68.     As part of the scheme, on or about each of the dates set forth below, in the

Western District of Pennsylvania, Dr. RICHARD A. RYDZE, Defendant herein, knowingly and

intentionally obtained and acquired possession of Hydrocodone-Acetaminophen 7.5-750, a

Schedule III controlled substance from the pharmacies listed below in the dosage quantities

stated:

| Count | Date | Quantity | Pharmacy |
|-------|------|----------|----------|
| 11 | 10/18/2007 | 100 | Rite Aid # 10929 |
| 12 | 10/28/2007 | 100 | Rite Aid # 10933 |
| 13 | 11/3/2007 | 100 | Rite Aid # 10956 |
| 14 | 11/9/2007 | 100 | CVS # 5094 |
| 15 | 11/15/2007 | 100 | Rite Aid # 10929 |
| 16 | 11/23/2007 | 100 | Rite Aid # 10956 |
| 17 | 12/3/2007 | 100 | Rite Aid # 10933 |
| 18 | 12/13/2007 | 100 | CVS # 5094 |
| 19 | 12/20/2007 | 100 | Rite Aid # 10929 |
| 20 | 12/28/2007 | 100 | Rite Aid # 10956 |
| 21 | 1/5/2008 | 100 | Rite Aid # 10933 |
| 22 | 1/12/2008 | 100 | CVS # 5094 |
| 23 | 1/17/2008 | 100 | Rite Aid # 10929 |

| Count | Date | Quantity | Pharmacy |
|-------|------|----------|----------|
| 24 | 1/25/2008 | 100 | Rite Aid # 10956 |
| 25 | 1/31/2008 | 100 | Rite Aid # 10933 |
| 26 | 2/7/2008 | 100 | CVS # 5094 |
| 27 | 2/14/2008 | 100 | Rite Aid # 10929 |
| 28 | 2/21/2008 | 100 | Rite Aid # 10956 |
| 29 | 2/26/2008 | 100 | Rite Aid # 10933 |
| 30 | 3/5/2008 | 100 | CVS # 5094 |
| 31 | 3/12/2008 | 100 | Rite Aid # 10929 |
| 32 | 3/19/2008 | 100 | Rite Aid # 10956 |
| 33 | 3/26/2008 | 100 | Rite Aid # 10933 |
| 34 | 4/2/2008 | 100 | CVS # 5094 |
| 35 | 4/10/2008 | 100 | Rite Aid # 10929 |
| 36 | 4/15/2008 | 100 | Rite Aid # 10956 |
| 37 | 4/23/2008 | 100 | Rite Aid # 10933 |
| 38 | 4/28/2008 | 100 | CVS # 5094 |
| 39 | 5/8/2008 | 100 | Rite Aid # 10929 |
| 40 | 5/14/2008 | 100 | Rite Aid # 10956 |
| 41 | 5/19/2008 | 100 | Rite Aid # 10933 |
| 42 | 5/25/2008 | 100 | CVS # 5094 |
| 43 | 6/1/2008 | 100 | Rite Aid # 10956 |
| 44 | 6/5/2008 | 100 | Rite Aid # 10929 |
| 45 | 6/17/2008 | 100 | Rite Aid # 10933 |
| 46 | 7/3/2008 | 100 | CVS # 5094 |
| 47 | 7/10/2008 | 100 | Rite Aid # 10929 |
| 48 | 7/18/2008 | 100 | Rite Aid # 10933 |
| 49 | 8/1/2008 | 100 | CVS # 5094 |
| 50 | 8/7/2008 | 100 | Rite Aid # 10929 |
| 51 | 8/19/2008 | 100 | Rite Aid # 10933 |
| 52 | 8/27/2008 | 100 | CVS # 5094 |
| 53 | 9/4/2008 | 100 | Rite Aid # 10929 |
| 54 | 9/19/2008 | 100 | Rite Aid # 10933 |
| 55 | 9/26/2008 | 100 | CVS # 5094 |
| 56 | 10/2/2008 | 30 | Rite Aid # 10929 |
| 57 | 10/13/2008 | 100 | Rite Aid # 10933 |
| 58 | 10/31/2008 | 100 | CVS # 5094 |
| 59 | 11/6/2008 | 100 | Rite Aid # 10929 |
| 60 | 11/21/2008 | 100 | Rite Aid # 10933 |
| 61 | 11/26/2008 | 100 | CVS # 5094 |
| 62 | 12/4/2008 | 100 | Rite Aid # 10929 |
| 63 | 12/16/2008 | 100 | Rite Aid # 10933 |
| 64 | 12/22/2008 | 100 | CVS # 5094 |
| 65 | 12/30/2008 | 100 | Rite Aid # 10929 |
| 66 | 1/14/2009 | 100 | Rite Aid # 10933 |
| 67 | 1/21/2009 | 100 | CVS # 5094 |
| 68 | 1/28/2009 | 100 | Rite Aid # 10929 |
| 69 | 2/11/2009 | 100 | Rite Aid # 10933 |
| 70 | 2/20/2009 | 100 | CVS # 5094 |
| 71 | 2/26/2009 | 100 | Rite Aid # 10929 |
| 72 | 3/9/2009 | 100 | Rite Aid # 10933 |
| 73 | 3/23/2009 | 100 | CVS # 5094 |
| 74 | 4/1/2009 | 100 | Rite Aid # 10929 |
| 75 | 4/9/2009 | 100 | Rite Aid # 10933 |
| 76 | 4/24/2009 | 100 | CVS # 5094 |
| 77 | 4/30/2009 | 100 | Rite Aid # 10929 |
| 78 | 5/8/2009 | 100 | Rite Aid # 10933 |
| 79 | 5/22/2009 | 100 | CVS # 5094 |
| 80 | 5/28/2009 | 100 | Rite Aid # 10929 |
| 81 | 6/3/2009 | 100 | Rite Aid # 10933 |
| 82 | 6/16/2009 | 100 | CVS # 5094 |
| 83 | 6/25/2009 | 100 | Rite Aid # 10929 |
| 84 | 7/2/2009 | 100 | Rite Aid # 10933 |
| 85 | 7/15/2009 | 100 | CVS # 5094 |
| 86 | 7/23/2009 | 100 | Rite Aid # 10929 |
| 87 | 7/30/2009 | 100 | Rite Aid # 10933 |
| 88 | 8/15/2009 | 100 | CVS # 5094 |
| 89 | 8/25/2009 | 100 | Rite Aid # 10933 |
| 90 | 9/3/2009 | 100 | Rite Aid # 10929 |
| 91 | 9/22/2009 | 100 | Rite Aid # 10933 |
| 92 | 9/30/2009 | 100 | CVS # 5094 |
| 93 | 10/6/2009 | 100 | Rite Aid # 10929 |
| 94 | 10/21/2009 | 100 | Rite Aid # 10933 |
| 95 | 10/27/2009 | 100 | CVS # 5094 |
| 96 | 11/5/2009 | 100 | Rite Aid # 10929 |
| 97 | 11/20/2009 | 100 | Rite Aid # 10933 |
| 98 | 11/30/2009 | 100 | CVS # 5094 |
| 99 | 12/10/2009 | 100 | Rite Aid # 10929 |
| 100 | 12/23/2009 | 100 | Rite Aid # 10933 |
| 101 | 12/31/2009 | 100 | CVS # 5094 |
| 102 | 1/7/2010 | 100 | Rite Aid # 10929 |
| 103 | 1/21/2010 | 100 | Rite Aid # 10933 |
| 104 | 2/10/2010 | 100 | CVS # 5094 |
| 105 | 2/18/2010 | 100 | Rite Aid # 10929 |
| 106 | 3/5/2010 | 100 | Rite Aid # 10933 |
| 107 | 3/12/2010 | 100 | CVS # 5094 |
| 108 | 3/18/2010 | 100 | Rite Aid # 10929 |
| 109 | 4/7/2010 | 100 | Rite Aid # 10933 |

| Count | Date | Quantity | Pharmacy |
|---|---|---|---|
| 110 | 4/15/2010 | 100 | CVS # 5094 |
| 111 | 4/22/2010 | 100 | Rite Aid # 10929 |
| 112 | 5/7/2010 | 100 | CVS # 5094 |
| 113 | 5/20/2010 | 100 | Rite Aid # 10929 |
| 114 | 5/28/2010 | 100 | CVS # 5094 |
| 115 | 6/16/2010 | 100 | Rite Aid # 10929 |
| 116 | 6/26/2010 | 100 | CVS # 5094 |
| 117 | 7/8/2010 | 100 | Rite Aid # 10929 |
| 118 | 7/24/2010 | 100 | CVS # 5094 |
| 119 | 8/5/2010 | 100 | Rite Aid # 10929 |
| 120 | 8/13/2010 | 100 | CVS # 5094 |
| 121 | 9/2/2010 | 100 | Rite Aid # 10929 |
| 122 | 9/10/2010 | 100 | CVS # 5094 |
| 123 | 9/23/2010 | 100 | Rite Aid # 10929 |

| Count | Date | Quantity | Pharmacy |
|---|---|---|---|
| 124 | 10/7/2010 | 100 | Rite Aid # 10929 |
| 125 | 10/16/2010 | 100 | CVS # 5094 |
| 126 | 10/28/2010 | 100 | Rite Aid # 10929 |
| 127 | 11/5/2010 | 100 | CVS # 5094 |
| 128 | 11/18/2010 | 100 | Rite Aid # 10929 |
| 129 | 11/27/2010 | 100 | CVS # 5094 |
| 130 | 12/8/2010 | 100 | Rite Aid # 10929 |
| 131 | 12/17/2010 | 100 | CVS # 5094 |
| 132 | 1/20/2011 | 100 | Rite Aid # 10929 |
| 133 | 2/24/2011 | 100 | Rite Aid # 10929 |
| 134 | 4/14/2011 | 100 | Rite Aid # 10929 |
| 135 | 6/2/2011 | 98 | Rite Aid # 10929 |
| 136 | 7/7/2011 | 100 | Rite Aid # 10929 |
| 137 | 8/18/2011 | 100 | Rite Aid # 10929 |
| 138 | 10/18/2011 | 100 | Rite Aid # 10929 |

All in violation of Title 21, United States Code, Section 843(a)(3).

## COUNTS 139 - 169

### (Health Care Fraud, in violation of 18 U.S.C. § 1347)

The Grand Jury further charges:

69.     Paragraphs 1 through 3 and 12 of the General Allegations are incorporated as though realleged in their entirety herein.

70.     From in or about March 2008 through October 17, 2011, in the Western District of Pennsylvania, and elsewhere, Dr. RICHARD A. RYDZE and WILLIAM ZIPF, Defendants herein, knowingly and willfully executed, attempted to execute, and aided and abetted the execution and attempted execution of a scheme and artifice to defraud a health care benefit program, and to obtain, by means of false and fraudulent pretenses, representations and promises described herein, money and property owned by, and under the custody and control of, a health care benefit program, in connection with the delivery of or payment for health care benefits, items and services.

-36-

71.    Paragraphs 53-59 of this Indictment are incorporated as though realleged in their entirety herein.

72.    It was part of the scheme for Dr. RICHARD A. RYDZE to write prescriptions for Oxycodone, Oxycontin, Oxymorphone, Oxycontin, and Opana in the names of WILLIAM ZIPF's family members who had health insurance.

73.    WILLIAM ZIPF's Relative 2 had health insurance covering prescription drugs through The IBM Medical Prescription Drug Supplement Plan ("The IBM Program"). The IBM Program was a private healthcare insurance program administered by Medco that provided prescription drug coverage for certain of IBM's employees and retirees. The IBM Program was a health care benefit program, affecting commerce, as that term is defined in Title 18, United States Code, Section 24(b).

74.    WILLIAM ZIPF's Relative 3 had prescription drug plan coverage through UPMC for Life. UPMC for Life was a Medicare Advantage organization with a Medicare contract. Medicare Part D provided coverage for outpatient prescription drugs through qualified private insurance plans that receive reimbursement from Medicare. Beneficiaries enrolled under Medicare Part B could obtain Part D benefits by enrolling with any one of many qualified prescription drug plans (PDPs.) Medicare PDPs, including UPMC for Life, were health care benefit programs, affecting commerce, as that term is defined in Title 18, United States Code, Section 24(b), under which outpatient prescription drugs are provided to Medicare beneficiaries.

75.    On or about the dates listed below, in the Western District of Pennsylvania and elsewhere, Dr. RICHARD A. RYDZE and WILLIAM ZIPF, Defendants herein, having knowingly and willfully executed and attempted to execute the scheme and artifice to defraud the health care benefit programs described above, and to obtain money from those health care benefit

programs, by means of the false and fraudulent pretenses, representations and promises described above, did so execute and attempt to execute the scheme by causing claims set forth below to be submitted, all for the purpose of executing said scheme and artifice:

| Count | Date of Claim | Paid Amount | Purported Patient | Health Care Benefit Program |
|---|---|---|---|---|
| 139 | 3/7/2008 | $214.19 | WILLIAM ZIPF Relative 2 | The IBM Program |
| 140 | 4/9/2008 | $250.21 | WILLIAM ZIPF Relative 2 | The IBM Program |
| 141 | 5/8/2008 | $250.21 | WILLIAM ZIPF Relative 2 | The IBM Program |
| 142 | 10/17/2008 | $253.29 | WILLIAM ZIPF Relative 2 | The IBM Program |
| 143 | 11/24/2008 | $253.29 | WILLIAM ZIPF Relative 2 | The IBM Program |
| 144 | 1/13/2009 | $270.96 | WILLIAM ZIPF Relative 2 | The IBM Program |
| 145 | 3/2/2009 | $270.96 | WILLIAM ZIPF Relative 2 | The IBM Program |
| 146 | 3/30/2009 | $270.96 | WILLIAM ZIPF Relative 2 | The IBM Program |
| 147 | 4/15/2009 | $270.96 | WILLIAM ZIPF Relative 2 | The IBM Program |
| 148 | 5/12/2009 | $270.96 | WILLIAM ZIPF Relative 2 | The IBM Program |
| 149 | 6/10/2009 | $270.96 | WILLIAM ZIPF Relative 2 | The IBM Program |
| 150 | 7/14/2009 | $270.96 | WILLIAM ZIPF Relative 2 | The IBM Program |
| 151 | 8/12/2009 | $289.66 | WILLIAM ZIPF Relative 2 | The IBM Program |
| 152 | 11/17/2009 | $289.17 | WILLIAM ZIPF Relative 2 | The IBM Program |
| 153 | 12/16/2009 | $289.17 | WILLIAM ZIPF Relative 2 | The IBM Program |
| 154 | 1/22/2010 | $289.17 | WILLIAM ZIPF Relative 2 | The IBM Program |
| 155 | 2/26/2010 | $289.17 | WILLIAM ZIPF Relative 2 | The IBM Program |
| 156 | 9/2/2010 | $308.87 | WILLIAM ZIPF Relative 2 | The IBM Program |
| 157 | 11/3/2010 | $275.88 | WILLIAM ZIPF Relative 2 | The IBM Program |
| 158 | 11/30/2010 | $542.85 | WILLIAM ZIPF Relative 2 | The IBM Program |
| 159 | 11/30/2010 | $658.71 | WILLIAM ZIPF Relative 3 | UPMC for Life |
| 160 | 12/27/2010 | $542.85 | WILLIAM ZIPF Relative 2 | The IBM Program |
| 161 | 1/2/2011 | $652.71 | WILLIAM ZIPF Relative 3 | UPMC for Life |
| 162 | 1/25/2011 | $542.85 | WILLIAM ZIPF Relative 2 | The IBM Program |
| 163 | 3/8/2011 | $576.94 | WILLIAM ZIPF Relative 2 | The IBM Program |
| 164 | 3/30/2011 | $687.05 | WILLIAM ZIPF Relative 3 | UPMC for Life |
| 165 | 3/31/2011 | $576.94 | WILLIAM ZIPF Relative 2 | The IBM Program |
| 166 | 5/13/2011 | $576.94 | WILLIAM ZIPF Relative 2 | The IBM Program |
| 167 | 6/10/2011 | $576.94 | WILLIAM ZIPF Relative 2 | The IBM Program |
| 168 | 10/6/2011 | $576.94 | WILLIAM ZIPF Relative 2 | The IBM Program |
| 169 | 10/17/2011 | $48.84 | WILLIAM ZIPF Relative 2 | The IBM Program |

All in violation of Title 18, United States Code, Sections 1347 and 2.

-38-

## COUNTS 170 - 184

### (Health Care Fraud, in violation of 18 U.S.C. § 1347)

The Grand Jury further charges:

76.     Paragraphs 1 through 3 and 12 of the General Allegations are incorporated as though realleged in their entirety herein.

77.     From in or about January 2010 through January 21, 2012, in the Western District of Pennsylvania, and elsewhere, Dr. RICHARD A. RYDZE, Defendant herein, knowingly and willfully executed, attempted to execute, and aided and abetted the execution and attempted execution of a scheme and artifice to defraud a health care benefit program, and to obtain, by means of false and fraudulent pretenses, representations and promises described herein, money and property owned by, and under the custody and control of, a health care benefit program, in connection with the delivery of or payment for health care benefits, items and services.

78.     It was part of the scheme for a patient, KK, to request that Dr. RICHARD A. RYDZE provide prescriptions for her and members of her family for prescription drugs, including controlled substances.

79.     It was part of the scheme for Dr. RICHARD A. RYDZE to call in prescriptions for the prescription drugs, including controlled substances, to various Pittsburgh-area pharmacies at KK's request.

80.     It was further part of the scheme for Dr. RICHARD A. RYDZE to put some of the prescriptions in the name of a relative of KK who had medical insurance, despite knowing that the prescriptions were not intended for use by that relative.

-39-

81.     It was part of the scheme that Dr. RICHARD A. RYDZE authorized prescriptions

for approximately 9,600 Vicodin ES pills in the name of KK or her family members between

January 2010 through January 21, 2012.

82.     KK's Relative 1 had health insurance through UPMC for You, a health care

benefit program, affecting commerce, as that term is defined in Title 18, United States Code,

Section 24(b).  UPMC for You is an affiliate of UPMC Health Plan which offers coverage to

eligible Medical Assistance recipients.  UPMC for You includes pharmacy benefits coverage.

83.     As part of the scheme, on or about March 5, 2011, KK sent the following text

message to Dr. RICHARD A. RYDZE: "Hey can you please call 90 ex vikes in [KK's Relative

4] name 3 refills 881 5120 tex me please".  KK had previously sent a text message to Dr.

RICHARD A. RYDZE stating that the prescription was for her mother's arthritis.  Dr.

RICHARD A. RYDZE responded: "Done.  Looking nice!"  On the same date, Dr. RICHARD A.

RYDZE telephonically contacted the Giant Eagle pharmacy and authorized 90 Vicodin tablets in

the name of KK's Relative 4.

84.     As part of the scheme, on or about March 8, 2011, KK sent the following text

messages to Dr. RICHARD A. RYDZE: (1) "Hey Sry could you please call me a z pack in &

cough medicine with codiene [KK's Relative 5] 881-5120 please tex me ASAP"; (2) "Hey F**k

that [KK's Relative 6] has such a bad uti could you please call cypro in 5312190 [KK's Relative

1] name tex me ASAP"; and (3)"Can you call that in for [KK's Relative No. 6] in [KK's Relative

1]'s name please".  On the same date, Dr. RICHARD A. RYDZE authorized a prescription for

Ciprofloxacin HCL tablets in the name of KK's Relative 1.  Dr. RICHARD A. RYDZE sent a

text message to KK stating, "Both done."  KK responded via text message, "OMG what do I owe

-40-

you? You are great. Can you call me a big Dick.in". Dr. RICHARD A. RYDZE responded via text message, "I want to f**k you so bad." KK responded, "Omg me too."

85.     As part of the scheme, on or about March 13, 2011, KK sent text messages to Dr. RICHARD A. RYDZE requesting that he call in prescriptions for another of KK's Relatives. Dr. RICHARD A. RYDZE sent a text message to KK asking how many pills a day. After KK responded, Dr. RICHARD A. RYDZE sent her a text message stating, "Done." KK sent a reply message stating, "Ty I told [KK's Relative 5] now he can't get mad when me & you have sex cause you did him a favor lol".

86.     As part of the scheme, on or about March 13, 2011, KK sent the following text message to Dr. RICHARD A. RYDZE: "Omg I'm Sry could you please call the day after pill in [KK's Relative 1] 5312190 please its really for [KK's Relative 6]". On or about March 14, 2011, Dr. RICHARD A. RYDZE authorized, and CVS filled a prescription for Next Choice tablets in the name of KK's Relative 1.

87.     As part of the scheme, on or about November 17, 2011, KK sent the following text message to Dr. RICHARD A. RYDZE: "Hey sweetie can you call me 90 ex viks in 3 refills [Relative 3] 884 4400 tex me! And dont forget about next week!" On or about November 18, 2011, KK sent the same text message to Dr. RICHARD A. RYDZE. On or about November 18, 2011, Dr. RICHARD A. RYDZE called Spartan Pharmacy, 3256 Brownsville Road, Pittsburgh, Pennsylvania, at (412) 884-4400 and authorized a prescription for 90 Vicodin ES tablets for Relative 3 as requested by KK. Dr. RICHARD A. RYDZE authorized three refills for this prescription, number 4023870. The prescription was filled on or about November 19, 2011, and refills were filled on December 12, 2011, January 6, 2012, and January 30, 2012.

-41-

88.     As part of the scheme, on or about November 29, 2011, KK sent the following text message to Dr. RICHARD A. RYDZE: "Hey can you please call that neurotin in 600 mg 2 pills a day 3 times a day! [KK's Relative 1] 885-5864! Please its for my sisters diabetes! Tex me!". On or about November 29, 2011, Dr. RICHARD A. RYDZE authorized, and CVS filled a prescription for 180 pills of 600 mg Gabapentin, the same medication as Neurontin, in the name of KK's Relative 1.

89.     As part of the scheme, on or about January 21, 2012, KK sent the following text message to Dr. RICHARD A. RYDZE: "Ty for the card! My life has changed forever! Could you do me a favor & call 90 ex vikes in [KK's Relative 1] name 531-2190 please tex me". Later that same day, KK sent another text to Dr. RICHARD A. RYDZE, stating, "Can you call that in sweetie". Dr. RICHARD A. RYDZE eventually responded by texting, "Done. Praying for you." On or about January 21, 2012, Dr. RICHARD A. RYDZE contacted the CVS Pharmacy and authorized ninety (90) Vicodin ES tablets in the name of KK's Relative 1 as requested by KK. CVS filled this prescription, number 836236, on January 21, 2012.

90.     On or about the dates listed below, in the Western District of Pennsylvania and elsewhere, Dr. RICHARD A. RYDZE, the defendant, having knowingly and willfully executed and attempted to execute the scheme and artifice to defraud the health care benefit program described above, and to obtain money from the health care benefit program, by means of the false

-42-

and fraudulent pretenses, representations and promises described above, did so execute and

attempt to execute the scheme by causing claims set forth below to be submitted, all for the

purpose of executing said scheme and artifice:

| Count | Date of Claim | Paid Amount | Purported Patient | Health Care Benefit Program |
|-------|---------------|-------------|-------------------|-----------------------------|
| 170 | 10/27/2010 | $17.34 | KK's Relative 1 | UPMC for You |
| 171 | 11/18/2010 | $18.02 | KK's Relative 1 | UPMC for You |
| 172 | 03/08/2011 | $9.84 | KK's Relative 1 | UPMC for You |
| 173 | 03/14/2011 | $30.72 | KK's Relative 1 | UPMC for You |
| 174 | 4/3/2011 | $26.01 | KK's Relative 1 | UPMC for You |
| 175 | 4/28/2011 | $26.01 | KK's Relative 1 | UPMC for You |
| 176 | 5/24/2011 | $26.01 | KK's Relative 1 | UPMC for You |
| 177 | 6/18/2011 | $26.01 | KK's Relative 1 | UPMC for You |
| 178 | 7/13/2011 | $26.01 | KK's Relative 1 | UPMC for You |
| 179 | 8/7/2011 | $26.40 | KK's Relative 1 | UPMC for You |
| 180 | 9/1/2011 | $26.15 | KK's Relative 1 | UPMC for You |
| 181 | 10/24/2011 | $21.52 | KK's Relative 1 | UPMC for You |
| 182 | 11/18/2011 | $21.52 | KK's Relative 1 | UPMC for You |
| 183 | 11/29/2011 | $160.75 | KK's Relative 1 | UPMC for You |
| 184 | 01/21/2012 | $22.52 | KK's Relative 1 | UPMC for You |

All in violation of Title 18, United States Code, Sections 1347 and 2.

## COUNT 185

### (Obstruction of Justice, in violation of 18 U.S.C. § 1503)

The Grand Jury further charges:

91.     From on or about January 17, 2012, and continuing until on or about February 5,

2012, in the Western District of Pennsylvania, and elsewhere, Dr. RICHARD A. RYDZE,

Defendant herein, did corruptly endeavor to influence, obstruct and impede the due

administration of justice in a federal grand jury which was empaneled in the Western District of

Pennsylvania and which Dr. RICHARD A. RYDZE knew had issued federal grand jury

-43-

subpoenas, by: (1) endeavoring to persuade witness AY to provide false testimony and

information; (2) endeavoring to persuade witness RHR to provide false testimony and

information; and (3) making false entries into the patient charts of patients CZ and MZM, all in

violation of Title 18, United States Code, Section 1503.

A True Bill.

FOREPERSON

ERIC H. HOLDER, JR.
Attorney General of the United States

By:

STEVEN M. DETTELBACH
United States Attorney
Northern District of Ohio
Matthew B. Kall (3003738-NY)
Carol M. Skutnik (0059704-OH)
Special Assistant U.S. Attorneys for the Western District of Pennsylvania
801 West Superior Avenue, Suite 400
Cleveland, Ohio  44113-1852