IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| v. | ) | Criminal No. 12-262 |
| | ) | |
| RICHARD A. RYDZE (1), and | ) | |
| JAMES HATZIMBES (3) | ) | |

## OPINION & ORDER ON MOTION TO SUPPRESS STATEMENT

Defendants Richard A. Rydze and James Hatzimbes are charged in a 185-count Indictment[1] alleging various violations of the Controlled Substances Act relating to anabolic steroids and human growth hormone; fraud; healthcare fraud; and obstruction of justice.[2]

Richard Rydze has filed a Motion to Suppress Statement Taken without Miranda Warnings (ECF No. 91) and a Motion to Suppress Proceeds of Search (ECF No. 92), in which Defendant James Hatzimbes has joined. In this Opinion we address the motion to suppress statements. A hearing on the motion was held on April 23 2014. At the hearing testimony

---

[1] The indictment was also filed against a third defendant, William Zipf, who has already been sentenced after having pleaded guilty to one count of conspiracy to distribute controlled substances (21 U.S.C. § 846) and one count of health care fraud (18 U.S.C. § 1347).

[2] Rydze is charged with all 185 counts as follows: Count 1: Conspiracy To Distribute Controlled Substances - Anabolic Steroids (21 U.S.C. §§ 846, 841(a)(1) & (b)(1)(E)); Counts 2-3: Distributing Controlled Substances - Anabolic Steroids (21 U.S.C. §§ 841(a)(1) & (b)(1)(E)); Count 4: Conspiracy To Unlawfully Distribute Human Growth Hormone (18 U.S.C. § 371); Counts 5-8: (21 U.S.C. § 333(e) and Unlawfully Distributing Human Growth Hormone (18 U.S.C. § 2); Count 9: Health Care Fraud (18 U.S.C. § 1347); Count 10: Conspiracy To Distribute Controlled Substances (18 U.S.C. § 846); Counts 11-138 Acquiring and Obtaining Possession of Controlled Substance By Misrepresentation, Fraud, Forgery, Deception and Subterfuge (21 U.S.C. § 843(a)(3); Counts 139-184 Health Care Fraud (18 U.S.C. § 1347); and Count 185: Obstruction Of Justice (18 U.S.C. § 1503).
    James Hatzimbes is charged in six counts as follows: Count 1: Conspiracy To Distribute Controlled Substances - Anabolic Steroids (21 U.S.C. §§ 846, 841(a)(1) & (b)(1)(E)); Counts 2-3: Distributing Controlled Substances - Anabolic Steroids(21 U.S.C. §§ 841(a)(1) & (b)(1)(E)); Count 4: Conspiracy To Unlawfully Distribute Human Growth Hormone (18 U.S.C. § 371); Counts 7-8: (21 U.S.C. § 333(e) and Unlawfully Distributing Human Growth Hormone (18 U.S.C. § 2).

1

was presented from FBI Special Agent Dominic Trippodo, FBI Special Agent Julie Halferty, James Mitchell ( a patient who was present at the time Agents executed a search warrant at Dr. Rydze's place of business), and Richard Rydze, M.D. For the reasons that follow we will deny Defendants' motion.

## I. Background

On March 21, 2011, federal agents served a search warrant on Dr. Rydze at his medical practice, Optimal Health Center, in Pittsburgh, Pennsylvania. The operation began at 9 a.m. and was executed by Special Agents from the Federal Bureau of Investigation, accompanied by a 4-person SWAT team charged with securing the premises. When the search warrant was executed agents entered the office with firearms drawn, but once the premises were secured the firearms were holstered. The agents who participated in the interview with Dr. Rydze were dressed in typical business attire.

At the time the search warrant was executed there were six employees and five patients present. The agents entered the premises, identified themselves, and informed the occupants that they were there to execute a search warrant. No one was placed under arrest.

Dr. Rydze's person was searched for safety reasons. Dr. Rydze recalled that he thought a weapon was drawn on him while he was being patted down, but he was not sure. He was told that he was not being arrested and that he was free to leave. The agent informed Dr. Rydze that if he chose to stay he would be accompanied by, or escorted by, an agent while he remained. Conversely he was informed that if he left the premises he would not be permitted back into the premises until the search was completed. The agents asked Dr. Rydze if he would like to talk, and Dr. Rydze agreed. Dr. Rydze testified that that his recollection

was that he was told he was free to leave only at the conclusion of the interview.

The interview was conducted by Special Agent Jodene Weber,[3] assisted by Special Agent Dominic Trippodo and Special Agent Julie Halferty. The interview occurred in Dr. Rydze's conference room, which was also a break room for the employees. The room was located at the end of the office hallway, adjacent to Dr. Rydze's personal office. The room had two entrances, one of which opened into Dr. Rydze's office and the other into the hallway. Dr. Rydze's office also had two doors, one that opened into the hallway as well as the one adjoining the conference room. Testimony revealed that the conference room had a conference table, several chairs, a refrigerator, and a window.

Dr. Rydze sat on a chair at the conference table closest to the door that opened into his office and across from the entrance to the hallway. Agents Trippodo and Halferty sat at the conference table on the side opposite the entrance to Dr. Rydze's office. Agent Webber sat across the conference table from Dr. Rydze, with her back to the entrance into the hallway. The doors to the room were closed but not locked. During the interview various agents conducting the search of the premises would enter and exit the conference room to speak with Agent Webber.

Dr. Rydze was not restrained during the interview, he was offered water, pizza, and restroom breaks. He chose not to take the agents up on the offers for food and water, and he did not request to use the restroom during the interview. The interview lasted approximately three hours, from about 9:30 a.m. to 12:30 p.m. Testimony indicated that generally the interview was "conversational" with Dr. Rydze voluntarily answering Agent Webber's

---

[3] At the time the search warrant was executed Special Agent Webber' surname was Renda, and therefore there are some documents and pleadings in this case that refer to Agent Renda.

questions. As the interview continued there were times when it turned confrontational and Agent Webber raised her voice when it appeared to her that Dr. Rydze was not being truthful. None of the agents threatened Dr. Rydze, and it appeared to the agents that Dr. Rydze wanted to keep talking. Dr. Rydze was not read Miranda warnings. At the end of the interview Dr. Rydze requested to use the restroom and he was escorted to the restroom by Agent Trippodo. The agents again informed Dr. Rydze that he was free to leave. He remained on the premises for approximately 15 to 20 minutes after the interview ended and then departed. The search was completed at approximately 5:00 p.m.

As a result of the questioning, a 16-page interview report was produced revealing that Dr. Rydze made incriminating statements during the interview. Dr. Rydze claims that by virtue of the circumstances in which he was questioned he was subject to a "custodial interrogation" and therefore should have been read his Miranda rights. The government counters that because Dr. Rydze was not subject to a custodial interrogation and was not "in custody" no Miranda warnings were required.

## II. Applicable Law

The Fifth Amendment to the United States Constitution provides that all criminal defendants have a privilege against self-incrimination. U.S. Const. Amend. V. Further, pursuant to Miranda v. Arizona, 384 U.S. 438 (1966), "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogations of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." United States v. Jackson, 2009 WL 3008993, *4 (W.D.Pa. 2009) (quoting Miranda, 384 U.S. at 444).

According to the Third Circuit, "[a] person is in custody when he either is arrested formally or his freedom of movement is restricted to 'the degree associated with a formal arrest." United States v. Willaman, 437 F.3d 354, 359 (3d Cir. 2006) (quoting United States v. Leese, 176 F.3d 740, 743 (3d Cir. 1999) (citation and internal quotation marks omitted)). Further, for a person to be in custody, while not formally arrested, "something must be said or done by the authorities, either in their manner of approach or in the tone or extent of their questioning, which indicates that they would not have heeded a request to depart or to allow the suspect to do so." Id. (quoting Steigler v. Anderson, 496 F.2d 793, 799 (3d Cir. 1974)) which quotes United States v. Hall, 421 F.2d 540, 545 (2d Cir. 1969)). Generally, under Miranda v. Arizona, law enforcement officers are only required to *Mirandize* a person that is "in custody." Id. (citing Miranda v. Arizona, 384 U.S. 436, 468 (1966)).

If there is not a formal arrest, the Third Circuit has explained that certain factors need to be examined to determine if a person is in custody, including:

> (1) whether the officers told the suspect he was under arrest or free to leave; (2) the location or physical surroundings of the interrogation; (3) the length of the interrogation; (4) whether the officers used coercive tactics such as hostile tones of voice, the display of weapons, or physical restraint of the suspect's movement; and (5) whether the suspect voluntarily submitted to questioning.

Willaman, 437 F.3d at 359-60. See also United States v. King, 604 F.3d 125 (3d Cir. 2010) (same), cert. denied, 131 S.Ct. 1467 (Feb. 22, 2011).

### III. Discussion

In examining each factor with the facts of this case, we conclude that Dr. Rydze was not in custody at the time he provided statements to the agents.

5

First, when executing the search warrant, Dr. Rydze was told by the agents that no one was going to be arrested and that he was in fact free to leave. The agents also told Dr. Rydze if he did leave he would not be permitted to return until after the search was completed. The agents also told him that he was permitted to stay on the premises, but he would have to stay in a chair in the lobby and be escorted for any restroom breaks. The agents asked Dr. Rydze if he was willing to answer questions, and he said he was.

Second, the interview took place in a mutually agreed upon place – the conference room adjacent to Dr. Rydze's personal office. The location is of course in Dr. Rydze's own office. Pictures of the room were entered into evidence revealing a fairly large conference table and the two entrances/exits, one leading into Dr. Rydze's personal office and the other into the hallway. Dr. Rydze sat at a chair at the conference table closest to the entrance door to his office. There is no evidence that Dr. Rydze was obstructed from leaving (for example, by an agent standing directly in front of the exits), nor was there any indication that Dr. Rydze asked to leave and his request was refused.

The third factor weighs in favor of Dr. Rydze as the length of the interview was long, lasting approximately three hours. However, in this case the testimony indicated that the length of the interview was due in part to the fact that Agent Webber and Dr. Rydze engaged in a mutual give and take that accounts in part for the extended length. Moreover, although he did not take up the offers, Dr. Rydze was offered food, water, and breaks during the interview, which suggests that the interview was not intentionally being lengthened in order to "wear down" Dr. Rydze by denying him access to food, water, and a restroom. In this regard it is important to note that the interview occurred around 9:30 a.m., presumably during a time

period in the workday when Dr. Rydze would have been seeing patients, as opposed to a search warrant executed at the end of a working day with an interview starting in the evening and extending three hours into the night.

Fourth, with respect to any coercive tactics of the agents and officers, this factor weighs in favor of the government. Although the agents of course possessed weapons, no weapons were displayed once the premises were secured. The agents wore business attire and offered Dr. Rydze food, water, and breaks. Dr. Rydze was not physically restrained and no agent was positioned in a manner so as to indicate that Dr. Rydze was not free to leave the conference room. Although Agent Webber did raise her voice, this occurred in the context of the conversation with Dr. Rydze at times when Agent Webber suspected Dr. Rydze of not being truthful. In contrast, testimony indicated that the majority of the interview, although tense, was a mutual conversational give and take.

Finally, with respect to whether Defendant voluntarily submitted to questioning, it is clear that Dr. Rydze voluntarily agreed to the interview and continued to voluntarily engage with the agents during the questioning.

We agree with defense counsel's argument that this case is distinguishable from the King case, but not in a manner that changes our conclusion. In King, the defendant first declined to speak with an FBI agent who telephoned him, but later voluntarily called the agent saying he changed his mind and wanted to speak. King then travelled to the FBI office by himself where he was interviewed. The Third Circuit court held that King was not "in custody" and thus there was no violation of the Fifth Amendment.

7

We do not find the difference in the fifth factor – whether the defendant voluntarily submitted to questioning – to be so significant that it would change the outcome we reach. The facts in this case clearly demonstrate that Dr. Rydze voluntarily agreed to the interview, albeit not in the manner in which King did. In contrast, in King the location of the interview at an FBI office was found by the Court to be "inherently more intimidating than most locations, such as a business office, an automobile, or a public street." King, 604 F.3d at 138.

We also find this case to be distinguishable from United States v. Finley in which we found that the circumstances of an interrogation conducted without Miranda warnings amounted to a custodial interrogation and therefore I suppressed the defendant's statements. United States v. Finley, Cr. No. 11-04 Erie, Minute Entry indicating Order issued at close of evidentiary hearing, Jan. 17, 2012 (ECF No.64 ), see also Tr. of Suppression Hearing (ECF No. 91), and Order dated Jan. 17, 2012 (ECF No. 65) (W.D.Pa. 2012).

In Finley, the agents who were already at Finley's apartment executing a search warrant called Finley's sister-in-law's cellphone, whom Finley was with, to tell Finley that the agents needed him to return to his residence quickly. When he did not return as fast as the agents desired, they called a second time demanding that he return home. Upon arrival Finley was searched and directed to a bedroom in his apartment where an agent blocked the only exit from the room while two other agents interviewed him. In contrast to this case, Finley did not voluntarily submit to questioning given that he was ordered back to his residence by the agents. In addition, the agents chose where the interview would take place and did not give Finley the opportunity to move about his apartment even escorted by an agent.

8

Here of course, the parties mutually agreed to conduct the interview in the conference room. Dr. Rydze was offered the opportunity for food, water, and to take breaks. He voluntarily agreed to be interviewed. The interview took place at Dr. Rydze's place of business. He was told that he was free to leave at any time. Under these circumstances we find that a reasonable person would feel free to leave the questioning, and therefore we further find that Dr. Rydze was not in custody.

**IV. Conclusion**

For the reasons stated herein, and considering the totality of the circumstances, we hold that Dr. Rydze was not "in custody" for purposes of <u>Miranda</u> and therefore there was no violation of Dr. Rydze's Fifth Amendment rights. Accordingly, Defendants' Motion to Suppress Statement Taken without Miranda Warnings be and hereby is DENIED.

A decision on Defendants' Motion to Suppress Proceeds of Search will be issued at a later date.

Date: _October 1, 2014_

_Maurice B. Cohill Jr._
Maurice B. Cohill, Jr.
Senior United States District Court Judge