# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Criminal No. 12-262 |
| ) | |
| RICHARD A. RYDZE (1), and ) | |
| JAMES HATZIMBES (3) ) | |

## OPINION & ORDER ON MOTION TO SUPPRESS STATEMENT

Defendants Richard A. Rydze and James Hatzimbes are charged in an Indictment alleging various violations of the Controlled Substances Act relating to anabolic steroids and human growth hormone ("HGH"); fraud; healthcare fraud; and obstruction of justice. A hearing on Defendants' Motion to Suppress Statement Taken without Miranda Warnings (ECF No. 91) was held on April 23 2014. On the same date we also heard argument and received evidence on Defendants' Motion to Suppress Proceeds of Search and Accompanying Motion for Franks Hearing (ECF No. 92). We previously issued an Opinion resolving the motion to suppress statements, and now address the remaining motion to suppress proceeds of the search and motion for a Franks hearing.

Defendants argue that the Search Warrant in this case lacks probable cause for several reasons. First, Defendants argue that the Affidavit of Probable Cause contains materially false statements or reckless omissions of fact rendering the warrant invalid under Franks v. Delaware, 438 U.S. 154, 155-56 (1978). Defendants contend that the statement in the Affidavit that Dr. Rydze saw patients at his medical practice and illegally prescribed anabolic steroids and HGH to patients for bodybuilding and anti-aging purposes, is a recklessly false statement used to justify a recklessly overbroad search warrant. Defendants also argue that the search warrant is overbroad and is an impermissible general warrant in violation of the

Search and Seizure Clause of the Fourth Amendment. Finally, as a result of the infirmities in the warrant, Defendants argue that all evidence gathered in the course of the searches, as well as any evidence, information, or other "fruit", flowing from the searches must be suppressed. For the reasons that follow we will deny Defendants' motion.

**I. Background**

On March 21, 2011, federal agents served a search warrant on Dr. Rydze at an office of his medical practice, Optimal Health Center, in Pittsburgh, Pennsylvania. The operation was led by Special Agent Jodene Renda, assisted by Special Agent Dominic Trippodo and Special Agent Julie Halferty, as well as other federal enforcement officers. Prior to executing the search warrant, Agent Renda submitted an Application for a Search Warrant, which was supported by her Affidavit of Probable Cause. The Affidavit of Probable Cause was in support of obtaining a search warrant for three target locations: Optimal Health Center (the location of Dr. Rydze's medical practice), HSE Anti-Aging & Wellness Center aka HSE Salon & Wellness Center ("HSE", a wellness center run by codefendant Mr. Hatzimbes), and Anew Rx (a compounding pharmacy run by William Sadowski, who was indicted on related charges in a separately filed case).

Paragraph 3 of the Affidavit of Probable Cause states: "This affidavit will show probable cause that Dr. Richard Rydze, a primary care physician at Optimal Health Center L.L.C. (Target Location #1) saw patients at this medical practice, as well as at HSE Anti-Aging & Wellness Center aka HSE Salon & Wellness Center (Target Location #2), and illegally prescribed anabolic steroids and human growth hormones to these patients for bodybuilding and anti-aging purposes." ¶ 3. The Agent further states that the Affidavit will

show probable cause that Dr. Rydze and Hatzimbes conspired with Anew Rx [Target Location #3], a compounding pharmacy owned and operated by William "Bill" Sadowski, to facilitate prescription orders for anabolic steroids and human growth hormone. This affidavit will also establish probable cause that Dr. Rydze committed health care fraud by fraudulently diagnosing patients with Pituitary Dwarfism, and subsequently submitted insurance claims for this diagnosis with corresponding prescription claims for anabolic steroids and human growth hormone. Further, this affidavit will show probable cause that Dr. Rydze and James Hatzimbes conspired to commit health care fraud by submitting insurance claims for durable medical equipment on behalf of DME PLUS, INC. that were not medically necessary.

Aff. ¶ 3. In Paragraph 4 of the Affidavit, the Agent further sets forth that the Affidavit will show probable cause for the following:

- that Dr. Rydze, Hatzimbes, and Sadowski conspired to possess with intent to distribute and dispense, to distribute and dispense, and to cause to be distributed and dispensed, not for legitimate medical purpose and outside the usual course of professional practice, the anabolic steroid testosterone and human growth hormone;

- that Dr. Rydze and Hatzimbes engaged in a scheme to defraud a health care benefit program; and

- that records relating to these violations (as specifically described in Attachments A-2, B-2, and C-2) will be found at Target Locations #1, #2, and #3.

Aff. ¶ 4.

In further support of the Application for a Search Warrant, Agent Renda set forth background information on the medical topics involved in the alleged violations of law, including information on obtaining and filling prescriptions, laboratory tests, the relevant drugs involved in this case, relevant medical diagnoses, health insurance systems and information, and specific information obtained during the investigation regarding numerous individuals. Aff. ¶¶ 6-18; 58-69. The Affidavit also includes detailed background information regarding the investigation, including information obtained from three

confidential sources and one identified source. Aff. ¶¶ 20-55.

More specifically, the Affidavit explains that the only approved uses for HGH are for hormonal deficiency that causes short stature in children; long-term treatment of short stature associated with Turner's Syndrome; adult short bowel syndrome; adult deficiency due to rare pituitary tumors or their treatment; and muscle-wasting disease associated with HIV/AIDS. Aff. ¶ 12. It is illegal for anyone to market, provide or distribute HGH for anti-aging or athletic purposes; and it is illegal for doctors to prescribe HGH for anti-aging or athletic purposes. Aff. ¶ 12.

Anabolic steroids are described in the Affidavit as any drug or hormonal substance related to testosterone (other than four specific types) that mimic the effects of the male sex hormone testosterone and dihydrotestosterone. Aff. ¶ 14. Anabolic steroids are Schedule III controlled substances, and can only lawfully be distributed pursuant to the order of a physician for the purpose of treating a disease. Aff. ¶ 14. Anabolic steroids also cannot be prescribed for performance enhancement. Aff. ¶ 13.

The Agent spelled out in extensive detail the background investigation. In June, 2010, FBI agents began an investigation into the unlawful distribution of certain durable medical equipment by a company called DME PLUS, INC., which is owned by codefendant Mr. Hatzimbes Aff. ¶ 20-21. Mr. Hatzimbes also is the owner of HSE, or Target Location #2 identified in the Affidavit. Aff. ¶ 21. That initial investigation revealed that Dr. Rydze was listed as an on staff physician at HSE. Aff. ¶ 22.

The Affidavit also set forth Dr. Rydze's background as a prominent physician for the Pittsburgh Steelers until the team removed him from his position following his 2007 personal credit card purchase of $150,000 of anabolic steroids and HGH from a pharmacy in Florida that was under investigation by multiple agencies. Aff. ¶ 24. Dr. Rydze was not charged with a crime but he did resign from his position with the University of Pittsburgh Medical Center, and thereafter opened his private practice at Optimal Health Center. Aff. ¶ 24. Further the Affidavit reveals that Dr. Rydze has been retained by the FBI Pittsburgh office as a contract medical physician since 1997, and that he was under a three-year contract set to expire on September 30, 2012. Aff. ¶ 24.

The Affidavit continues to explain in detail the relationships among Dr. Rydze, Mr. Hatzimbes, Mr. Sadowski, and several others; Dr. Rydze's participation in so-called steroid clinics held at Mr. Hatzimbes' business; and Dr. Rydze's prescription referral and financial remuneration relationship with Anew Rx compounding pharmacy. Furthermore, the Affidavit sets forth a lengthy and detailed description of information learned from three confidential sources, including the two sources that contacted Dr. Rydze. The Affidavit also explains the Agents' review of the information provided by Highmark during the investigation.[1] The Affidavit also relies on consensual recordings, documentary evidence obtained through the relevant pharmacies and Highmark, phone and billing records, as well as other information

In short, the Affidavit is not merely a lengthy description of unrelated allegations but is in fact a detailed and thorough description of a methodical investigation, including information to educate the magistrate judge about relevant technical, medical, and health insurance issues.

---

[1] Highmark, the medical insurer for many of these patients, cooperated in the investigation.

The Affidavit also sets forth indications of unlawful activity from sources such as the filling of prescriptions in Dr. Rydze's name even though he had not met the individuals; Dr. Rydze issuing prescriptions for anabolic steroids and HGH for people who did not have a medical need; the use of cash payments for prescriptions; and conversations with Dr. Rydze and persons associated with Dr. Rydze indicating conduct involving the unlawful distribution and use of anabolic steroids and HGH. Much of the indicated illegal activity was then corroborated by two confidential sources when they successfully obtained prescriptions for anabolic steroids and HGH from Dr. Rydze even though they did not have a lawful medical need for the drugs.

## II. Applicable Law

The Fourth Amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizure, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. Amend. IV.

### A. Probable Cause

When making a probable cause determination, a magistrate must ascertain "whether there is a 'fair probability that contraband or evidence of a crime will be found in a particular place.'" United States v. Conley, 4 F.3d 1200, 1205 (3d Cir. 1993) (quoting Illinois v. Gates, 462 U.S. 213, 238 (1983) (internal citations omitted)), *cert. denied*, 510 U.S. 1177 (1994). The test set forth in Gates requires that the issuing magistrate "make a practical, common sense decision whether, given all the circumstances set forth in the affidavit before him,

including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information" there is probable cause to support a warrant. Id. at 238. A magistrate's "determination of probable cause should be paid great deference by reviewing courts." Id. at 236.

"The duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for . . . conclud[ing]' that probable cause existed." Gates, 462 U.S. at 236 (quoting Jones v. United States, 362 U.S. 257, 271 (1960)). "The supporting affidavit must be read in its entirety and in a commonsense and nontechnical manner." Conley, 4 F.3d at 1208. A warrant must be upheld "as long as there is a substantial basis for a fair probability that evidence will be found." Id. at 1205. Reviewing courts must not "simply rubber stamp a magistrate's conclusions." United States v. Tehfe, 722 F.2d 1114, 1117 (3d Cir. 1983) (*cert. denied sub nom.*, Sanchez v. United States, 466 U.S. 904 (1984)). However, the United States Supreme Court has directed that "resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants." Conley, 4 F.3d at 1205 (quoting United States v. Ventrusca, 380 U.S. 102, 109 (1965) (quoted with approval in Gates, 462 U.S. at 237 n.10)).

### B. Franks Hearing

Defendants argue, in part, that the Affidavit of Probable Cause in this case contains materially false statements or reckless omissions of fact rendering the search warrants invalid under Franks v. Delaware, 438 U.S. 154, 155-56 (1978). "The Fourth Amendment prohibits the intentional or reckless inclusion of a material false statement (or omission of material information) in a search-warrant affidavit." United States v. Pavulak, 700 F.3d 651, 665 (3d Cir. 2012), citing United States v. Yusuf, 461 F.3d 374, 383–84 (3d Cir. 2006).

7

A defendant may be entitled to a Franks hearing if he is able to make a "substantial preliminary showing" that the affiant knowingly or recklessly omitted facts from the affidavit (or included a false statement in the affidavit) and is able to demonstrate that the omitted facts (or false statements) are "necessary to the finding of probable cause." Pavulak, 700 F.3d at 665, quoting Yusuf, 461 F.3d at 383–84.

The United States Court of Appeals for the Third Circuit has applied Franks to cases where the defendant alleges that facts have been deliberately or recklessly omitted from a supporting affidavit. United States v. Frost, F.2d 737, 742-43 & n.2 (3rd Cir. 1993). More specifically, the Third Circuit Court has explained that "(1) omissions are made with reckless disregard for the truth when an officer recklessly omits facts that any reasonable person would know that a judge would want to know: and (2) assertions are made with reckless disregard for the truth when an officer has obvious reasons to doubt the truth of what he or she is asserting." Wilson v. Russo, 212 F.3d 781, 783 (3rd Cir. 2000).

In addition to finding that the statements were recklessly or knowingly omitted from the affidavit, the court must also determine whether the missing statements were "material, or necessary, to the finding of probable cause." Sherwood v. Mulvihill, 113 F.3d 396, 399 (3rd Cir. 1997). The materiality of the omissions is determined by "excis[ing] the offending inaccuracies and insert[ing] the facts recklessly omitted, and then determine whether or not the 'corrected' warrant affidavit would establish probable cause." Wilson, 212 F.3d at 789, citing Sherwood, 113 F.3d at 399.

## C. General and Overbroad Search Warrants

Defendants argue on one hand that the Search Warrant is an impermissible "general warrant," and on the other hand, that it is impermissibly overbroad. These two concepts are related but distinct violations of the Fourth Amendment.

The United States Court of Appeals for the Third Circuit explains that a "general warrant is a warrant that authorizes 'a general exploratory rummaging in a person's belongings.'" United States v. Christine, 687 F.2d 749, 752 (3d Cir. 1982), quoting Coolidge v. New Hampshire, 403 U.S. 443, 467, 91 S.Ct. 2022, 2038, 29 L.Ed.2d 564 (1971).

> The Fourth Amendment seeks to prevent general warrants by requiring all warrants to contain a "particular description" of the things to be seized. The particularity requirement "makes general searches ... impossible and prevents the seizure of one thing under a warrant describing another. As to what is to be taken, nothing is left to the discretion of the officer executing the warrant."

Christine, 687 F.2d at 752, quoting Marron v. United States, 275 U.S. 192, 196, 48 S.Ct. 74, 76, 72 L.Ed. 231 (1927). "In determining whether a warrant is general, courts focus on the level of direction given to the executing officers and the level of discretion required of them in conducting the search. United States v. Wecht, 619 F.Supp.2d 213 226 (W.D.Pa. 2009), citing United States v. Leveto, 540 F.3d 200, 211 (3d Cir. 2008). All evidence seized pursuant to a general warrant is subject to suppression. Christine, 687 F.2d at 758; United States v. Yusuf, 461 F.3d 374, 393 n. 19 (3d Cir. 2006) ("the only remedy for a general warrant is to suppress all evidence obtained thereby").

On the other hand, "[a]n overly broad warrant 'describe[s] in both specific and inclusive generic terms what is to be seized,' but it authorizes the seizure of items as to which there is no probable cause." United States v. Ninety-Two Thousand Four Hundred Twenty-

Two Dollars and Fifty-Seven Cents ($92,422.57), 307 F.3d 137, 149 (3d Cir. 2002), quoting Christine, 687 F.2d at 753–54. "The Fourth Amendment dictates that a magistrate may not issue a warrant authorizing a search and seizure which exceeds the ambit of the probable cause showing made to him." Christine, 687 F.2d at 753. "'(A)n otherwise unobjectionable description of the objects to be seized is defective if it is broader than can be justified by the probable cause upon which the warrant is based.'" Id., quoting 2 W. LaFave, Search and Seizure: A Treatise on the Fourth Amendment, s 4.6, at 97 (1978). Accordingly, a district court determines whether a warrant is overbroad "by measuring the scope of the search and seizure authorized by the warrant against the ambit of probable cause established by the affidavit upon which the warrant issued." Christine, 687 F.2d at 753. "[A]n overly broad warrant can be redacted to strike out those portions of the warrant that are invalid for lack of probable cause, maintaining the remainder of the warrant that satisfies the Fourth Amendment." Yusuf, 461 F.3d at 393 n. 19. "Evidence seized pursuant to an overly broad warrant need not be suppressed if the good faith exception applies." Ninety-Two Thousand Four Hundred Twenty-Two Dollars and Fifty-Seven Cents ($92,422.57), 307 F.3d at 149.

### III. Discussion

Defendants present, in an overlapping manner, several interrelated arguments attacking the Affidavit of Probable Cause and Search Warrant. At the root of Defendants' arguments is their allegation that the government bases the Affidavit on the erroneous assumption that because Dr. Rydze in fact prescribed anabolic steroids and HGH that he must have been doing so illegally. Accordingly, Defendants begin with the assertion that prescribing anabolic steroids and HGH is a legal activity under certain circumstances. In

further support of their argument, Defendants also rely on the fact that proper medical treatment of patients calls for or requires that a physician order certain laboratory tests that by themselves are not indicative of unlawful activity.

Defendants then criticize the Affidavit's reliance on two confidential human sources who separately sought to obtain anabolic steroids and/or HGH from Dr. Rydze. Dr. Rydze or his nurse ordered blood tests for each source and eventually Dr. Rydze provided each source with the sought after prescriptions. Defendants argue that there is nothing criminal in this activity, and it is in fact quite normal.

Defendants next criticize the Affidavit's allegations regarding ninety of Dr. Rydze's patients whose medical claims submitted to Highmark indicated a diagnosis code of Pituitary Dwarfism. Defendants claim that a more thorough investigation would have revealed that the diagnosis code for these patients did not reflect the *actual* medical diagnosis of the patient by Dr. Rydze. According to Defendants, the diagnosis code occurred as a result of a staff member, not Dr. Rydze, choosing which code to put on the form. Defendants further criticize the Pituitary Dwarfism allegations for failing to address the fact that even though the patients do not fit the criteria for Pituitary Dwarfism, medical records introduced by Defendants show that some patents were nonetheless receiving proper, lawful medical treatment for their conditions.

Next, Defendants criticize the allegations supporting the request for 947 patient records identified by the Agent as patients for whom Dr. Rydze had ordered certain specified laboratory tests. Defendants argue that the diagnostic tests identified in the Affidavit are so broad as to encompass routine and obligatory blood work, which any doctor may order and in

11

some cases would be required to order. Defendants highlight the over breadth of the requested evidence by pointing to several locally well-known individual patients where there were "obvious reasons to doubt that any criminal conduct [was] involved," as well as lesser-known individuals in cases where the actual diagnosis and associated blood work ultimately revealed there was no criminal conduct. Def. Br. 7. Defendants then point to evidence to show that some of the patients that were encompassed in the government's request for patient records actually had deficient laboratory test results that validated a medically recognized purpose for prescribing anabolic steroids or HGH. Related to this last argument is Defendants' overarching argument that the Affidavit "omits determinative information, specifically the blood tests themselves and the results of tests which pointed to the fact that the government had absolutely no evidence that Dr. Rydze was engaged in any criminal activity in relation to numerous patients whose files were nonetheless among those to be seized." Def. Br. 12.

In addition to Defendants' arguments set forth above, Defendants also argue that the Search Warrant is overbroad in its request for the wholesale seizure of electronic devices and the electronic contents therein. Finally, Defendants argue that the Warrant is an impermissible General Warrant because it is not limited and specific in authorizing seizure of "documentation of patient visits" since it contains the express language "including but not limited to" in listing the items to be seized. Thus, Defendants argue that this allows an officer, not the magistrate, to determine what is to be seized.

Defendants' arguments are comprehensive, well-researched, and supported by significant documentary evidence. We have carefully reviewed Defendants' arguments as

well as the Application for a Search Warrant and the accompanying Affidavit of Probable Cause. However, we agree with the government that Defendants' arguments are ultimately an attack on the sufficiency of the evidence, and we do not find that the arguments successfully challenge the Search Warrant or Affidavit of Probable Cause. Accordingly, we will deny the motion for a Franks hearing and the Motion to suppress evidence.

As we have stated, a defendant may be entitled to a Franks hearing if he is able to make a "substantial preliminary showing" that the affiant knowingly or recklessly omitted facts from the affidavit and is able to demonstrate that the omitted facts are "necessary to the finding of probable cause." Pavulak, 700 F.3d at 665, quoting Yusuf, 461 F.3d at 383–84. Defendants' argue that specific patient medical records and corresponding Highmark documentation revealing Dr. Rydze administered legitimate and lawful medical treatment should have been reviewed and included in the Affidavit. In addition, Defendants also argue that medical literature regarding the diagnosis and treatment of conditions relevant to the conduct outlined in the Affidavit should also have been included in the Affidavit. Defendants' argument includes a general assumption that the government's central basis of the Affidavit of Probable Cause is that ordering blood tests or using the Pituitary Dwarfism diagnosis code are indicators of illegal prescribing activity.

We disagree that the government recklessly or intentionally omitted facts necessary to the finding of probable cause. The Affidavit of Probable Cause reveals a careful, measured investigation that was built on the facts as they were discovered during the course of the investigation. There is nothing in the Affidavit or in the government's brief to suggest that the Agent believed that ordering blood tests is in and of itself indicative of illegal activity. As the

13

government points out, the question the Agent was investigating was whether Dr. Rydze was falsifying blood work prescriptions for patients to subsequently provide illegal prescriptions for the anabolic steroids and HGH.  The Affidavit describes in detail the activity of two confidential sources that requested, in one form or another, that Dr. Rydze provide them with a means to obtain anabolic steroids or HGH for purposes that are not lawfully permitted, and Dr. Rydze did so.  Confidential Source One obtained a prescription for anabolic steroids and HGH after explaining to Dr. Rydze that the drugs were for body building purposes.  Confidential Source Two received prescriptions for HGH after plainly communicating to Dr. Rydze's nurse and Dr. Rydze that the drugs would be for weight loss and fatigue.  The Affidavit also describes in detail numerous conversations among the confidential sources, Dr. Rydze, and other relevant persons, in which the unlawful use of hormones is freely discussed.

Dr. Rydze ordered blood work for both confidential sources.  The Agent viewed the specific blood tests ordered as tests that, when ordered by Dr. Rydze, may indicate activity in furtherance of the unlawful distribution of hormones or testosterone.  Defendants would have us isolate our analysis on the fact that a doctor ordering lab work, especially before he decides to prescribe, is an unremarkable and innocent activity.  However, viewing the information in the Affidavit in context and in a common sense manner leads to the conclusion that Dr. Rydze was engaged in unlawful behavior.

The Agent also sought seizure of patient records for ninety patients who received a diagnosis code of Pituitary Dwarfism.  The Affidavit clearly sets forth the medical coding information regarding Pituitary Dwarfism, including the significant fact that this diagnosis applies to children, and that it will result in the person affected being less than 5 feet tall.

14

Agent Renda cross-referenced the list of patients with their driver's licenses indicating their age and height.

In addition, Agent Renda sought the opinion of medical doctors with regard to the diagnoses. One of the doctors explained that Pituitary Dwarfism is a pediatric diagnosis, utilized when laboratory testing indicates that a child's pituitary gland is not producing growth hormone. The Agent also learned from the doctor that children diagnosed with Pituitary Dwarfism fail to grow, and thus have dwarfed limbs, different facial characteristics, and again, that such patients do not reach five feet in height by adulthood.

Her investigation revealed that none of the patients coded as "Pituitary Dwarfs" met the medical criteria. Based on all the information she learned, which is included in the Affidavit, Agent Renda concluded that Dr. Rydze was likely misusing the Pituitary Diagnosis code in a way to facilitate unlawful prescribing conduct.

We disagree with Defendants' argument that specific information contained in the medical records of some of the ninety patients revealing a legitimate medical need was recklessly or intentionally omitted from the Affidavit. The Affidavit in support of the application for a search warrant set forth information to support seizing such records directly from Dr. Rydze's medical practice. The Agent did not have those records. Moreover, the investigation revealed that what Dr. Rydze includes in his own records or in submissions for health insurance claims may not reflect his or his patients' actual intention. In addition, we are reluctant to impose on an investigating agent the need to conduct more detailed research into medical records after having already applied objective criteria to identify a set of patients that may reveal evidence that Dr. Rydze was engaged in unlawful activity. The objective

criteria here includes the diagnosis code of Pituitary Dwarfism, the definition of Pituitary Dwarfism, two medical doctors' opinions regarding the likelihood of an illegal purpose in using such a diagnosis code, and the ages and heights of the patients who received the diagnosis code.

Similarly, Agent Renda took an objective view of the evidence she had when identifying the 947 patient records to be seized. The investigation showed that when engaging in the unlawful prescription of anabolic steroids or HGH that Dr. Rydze would order certain laboratory tests. Of course, viewed in isolation, ordering such tests is innocent activity, but here the evidence the Agent had already gathered indicated that Dr. Rydze's unlawful prescribing conduct was built upon him first ordering innocuous blood tests. Therefore, it was Dr. Rydze's course of conduct that necessitated that the Agent seek evidence of further unlawful conduct related to other patients.

In one recorded conversation with a confidential source regarding whether insurance would cover blood work, Dr. Rydze said "I just put some diagnosis down, that should make it covered." Aff. ¶ 31. We understand Defendants' argument that this statement by itself does not indicate an unlawful purpose, but when viewing the Affidavit as a whole, the reasonable common-sense conclusion is that there was not a valid medical basis for the blood work because the true purpose was to unlawfully provide the source with anabolic steroids and HGH. In addition, the interactions between the source and Dr. Rydze (and his associates), seen in light of the other information in the Affidavit, highlight the fact that Dr. Rydze never said to either source that he does not prescribe anabolic steroids or HGH for the purposes presented by the sources.

The list of tests ordered by Dr. Rydze for the confidential sources played a major role in the selection of patient files for seizure. We find that it was reasonable for the Agent to request the seizure of patient files where Dr. Rydze had used diagnoses similar to the laboratory tests ordered for the sources. We agree with the government that the Agent was not in a position to assess the veracity of the laboratory tests Dr. Rydze ordered. The medical records sought clearly had potential evidentiary value even if some of the records turned out to be for legitimate medical purposes. The Agent did not, and could not, know in advance which files were legitimate and which were not.

Whether viewed from the position of the investigator or a neutral detached Magistrate reviewing the Affidavit of Probable Cause, it is unremarkable that certain individuals on the list of 947 patients were well-known. The fact that an agent or magistrate might reasonably assume that the identified well-known person is not connected with unlawful conduct is an insufficient basis for either the Agent or the Magistrate to exclude such persons. As government counsel stated at oral argument, Agent Renda did not put blinders on and instead went with the evidence exactly as it appeared in the documentation and she followed the evidence to arrive at the list of individuals.

After consideration of the Affidavit of Probable Cause and the normal inferences that can be drawn from the information in the Affidavit, we conclude that there was a substantial basis for the magistrate to believe that evidence of unlawful activity would be found in the target locations. For the reasons stated above we also find that the Search Warrant is not overbroad. In addition, we do not find the Warrant to be overbroad in its specification for seizure of electronic and digital equipment and information.

We also see no basis to find that the Warrant here is an impermissible general warrant. Specifically, Defendants argue that the warrant is not limited and specific in authorizing seizure of "documentation of patient visits" since it contains the express language "including but not limited to." Defendants complain that this allows the officer, rather than the magistrate, to determine what is to be seized. We disagree; the limiting term here is "documentation of patient visits," which is specific and particular. If the item is related to a patient visit it should be seized; if it is not related, then it should not be seized. The examples Defendants cite as possibly being problematic are in fact easy cases: they are all examples of items that are related to documentation of patient visits and in accord with the information provided in the Affidavit of Probable Cause. Moreover, the Affidavit does limit the request for seizure of records to a set number of patients (albeit a large number), the date range in which the lab tests were ordered, and the single lab at which the tests were conducted.

It is a difficult task to separate and address Defendants' various arguments since there is much overlap in the arguments. We have attempted to present our overall conclusion that the Affidavit of Probable Cause in this case was sufficient to establish probable cause, that there was no <u>Franks</u> violation, and that the Search Warrant was neither overbroad nor a general warrant. In any criminal investigation that involves primarily legitimate activity, such as a well-respected and prominent physician engaging in a medical practice, there will often be lawful conduct occurring at the same time as alleged unlawful conduct. It should not be a surprise that the unlawful conduct will follow the form and practices and procedures of the lawful conduct, but that cannot be used as shield to block a search when the totality of the circumstances revealed by an investigation indicate that unlawful activity is occurring.

## IV. Conclusion

For the reasons stated herein, Defendants' Motion to Suppress Proceeds of Search and Accompanying Motion for Franks Hearing (ECF No. 92) be and hereby is DENIED. A pretrial order will be issued at a later date to set deadlines for motions in limine, proposed voir dire, proposed points for charge, as well as dates for the final pretrial conference, jury selection, and jury trial.

Date: December 15, 2014

Maurice B. Cohill, Jr.
Senior United States District Court Judge